Robert P. Harrington (12541)
**KUNZLER BEAN & ADAMSON, PC**
50 W Broadway, Suite 1000
Salt Lake City, Utah 84101
Telephone: (801) 994-4646
Email: rharrington@kba.law

Charles Miller (*pro hac vice* pending)
Courtney Corbello (*pro hac vice* pending)
**INSTITUTE FOR FREE SPEECH**
1150 Connecticut Ave., NW, Suite 801
Washington, D.C. 20036
Tel: (202) 985-1644
Fax: (202) 301-3399
Email: cmiller@ifs.org
Email: ccorbello@ifs.org

*Attorneys for Plaintiffs Utah Political Watch, Inc., and Bryan Schott*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| UTAH POLITICAL WATCH, INC., and BRYAN SCHOTT,<br><br>    Plaintiffs,<br>v.<br><br>ALEXA MUSSELMAN, Utah House of Representatives Communications Director and Media Liaison Designee; AUNDREA PETERSON, Utah Senate Deputy Chief of Staff and Media Liaison Designee; ABBY OSBORNE, Utah House of Representatives Chief of Staff; and MARK THOMAS, Utah Senate Chief of Staff, in their official and individual capacities;<br><br>    Defendants. | **PLAINTIFFS' REPLY IN SUPPORT OF TEMPORARY RESTRAINING ORDER**<br><br>Case No. 2:25-cv-0050-RJS-CMR<br><br>Judge Robert J Shelby<br>Mag. Judge Cecilia M. Romero |

Defendants state that they did not issue a press credential to plaintiff Brian

Schott because he is self-edited and plaintiff Utah Political Watch, Inc. is owned by, and only employs Schott—making a form of an alter ego argument. But paradoxically, Defendants simultaneously argue that UPW/Schott is a new entrant into covering politics and isn't sufficiently established. This justification is advanced despite the fact that Schott has been covering the Utah legislature as a career for probably longer than some of those involved in the decision have been alive. If Schott is the institution, he is unquestionably well established. And as discussed below, requiring third-party oversight or responsibility neither comports with the First Amendment nor is an effective proxy for determining who is a "true" journalist.

The definition Defendants' now advance for 'independent journalist' is not evident from the face of the policy, which is void for vagueness.

There is no question Schott and his audience are harmed by the denial of credentials and no harm will befall the State should the TRO be issued. Accordingly, the TRO should issue prohibiting the Defendants from denying Schott's application for media credentials.

I. The Explanation Defendants' Advance for Excluding Plaintiffs is Unconstitutional Content Based Discrimination.

The defendants acknowledge that Schott is a long-standing statehouse reporter who has drawn their ire. They acknowledge that their exclusion of him cannot be based upon a conclusion that his work product is not journalistic, or that they disfavor his views. They do not claim that there is not space for him. They simply argue that as a self-edited journalist without a supervisor, he doesn't meet their

arbitrary definition of journalist.

Defendants' definition of journalist fails scrutiny because it has no nexus to the actual substantive work that a journalist performs. The constitutional problem of trying to define who is a journalist has been noted by other courts. "The proliferation of communications media in the modern world makes it impossible to construct a reasonable and useful definition of who would be a 'reporter' eligible to claim protection from a newly minted common law privilege. Reporters cannot be readily identified. They do not have special courses of study of special degrees. They are not licensed. They are not subject to any form of organized oversight or discipline." *Lee v. Department of Justice*, 401 F. Supp. 2d 123, 140 (D.D.C. 2005).

Defendants' position that they can simply define independent journalists and bloggers out of the category is patently wrong. *Irizarry v. Yehia*, 38 F.4th 1282, 1286 (10th Cir. 2022) (Youtuber and blogger was considered by Court to be a "journalist" who had a First Amendment right to news gather).

Editorial control is at the center of the freedom of the press. The government has no power or authority to dictate whom a journalist uses as an editor (or who the editor uses as a journalist). In the landmark case of *New York Times Co. v. Sullivan*, the Court spoke of "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." 376 U.S. 254, 270 (1964). In *Miami Herald Publishing Co. v. Tornillo,* the United States Supreme Court lamented the consolidation of media platforms and the loss of multiple competing newspapers in each city: "The obvious solution, which was available to

dissidents at an earlier time when entry into publishing was relatively inexpensive, today would be to have additional newspapers. But the same economic factors which have caused the disappearance of vast numbers of metropolitan newspapers, have made entry into the marketplace of ideas served by the print media almost impossible." *Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241, 251 (1974). The internet has gone a long way to restoring the order that prevailed in our country for nearly two centuries—multiple competing voices providing news and information.

Defendants, however, now accustomed to a consolidated press, think they can dictate that journalists consolidate and work in structures that the legislature approves of. Defendants' discussion of the history of their policies show that they want a press pass holder to work for an "institution that hire and fire, can be held responsible for actions, sued for libel" and have a third-party who edits the work. Doc 26, PageID 195. By demanding that passholders be subject to "firing," and that others, presumably with deeper pockets, can be sued for their work, Defendants think they can create a more responsible, less "stream of consciousness" press.

To the contrary, the Supreme Court has held that "[a] responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated." *Tornillo*, 418 U.S. at 256. Yet, legislating a responsible press is precisely what Defendants say they are trying to do. And it is why the policy is invalid as applied to Plaintiffs. *Id.* ("Governmental restraint on publishing need not fall into familiar or traditional

patterns to be subject to constitutional limitations on governmental powers.").

Requiring that a journalist submit to a third-party editor is an infringement upon the journalist's speech. Requiring a reporter to work for a larger organization means only those wealthy enough to own newspapers, platforms, or broadcast stations have protected rights to publish. Defendants discriminate against the content of Plaintiffs' publication—self-edited journalism, which Defendants derisively call stream of conscious blogging. As such, the rule is subject to strict scrutiny. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828-30 (1995).[1]

"Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). The government bears the burden of demonstrating a compelling government interest and narrow tailoring to achieve a permissible goal. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.").

---

[1] Defendants paradoxically argued that Plaintiffs ignored the "framework" for analyzing this claim, while stating we relied upon the correct cases. Plaintiffs stated that defendants provide "a limited public forum," and analyzed the case under this correct standard. Doc 3, PageID 65. After several pages of claiming disagreement on this point, defendants ultimately agree that they host a limited public forum. Doc 26, PageID 207. In limited public fora, governments cannot engage in content or viewpoint based discrimination.

The effect of the Utah legislature dictating that a passholder cannot self-edit "fails to clear the barriers of the First Amendment because of its intrusion into the function of editors. . . . The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials -- whether fair or unfair -- constitute the exercise of editorial control and judgment." *Id*. at 258. Editorial discretion is constitutionally sacrosanct. "It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time." *Id.* Government cannot dictate editorial choices of journalistic endeavors.

Utah Political Watch made the choice to be a journalist-edited publication. Schott is the editor. He selects which stories to report and sets the tone of the organization. He compiles a daily newsletter that contains original reporting, links to relevant stories from other news organizations, discusses the legislative calendar, and highlights legislation Utah Political Watch is tracking. Scott is also the journalist who covers the legislature for Utah Political Watch. Defendants cannot bar him from wearing these two hats.

A recent Supreme Court case explains that it is problematic for governments to hold intermediaries to account for a person's speech. In *NRA v. Vullo,* the Supreme Court reviewed the actions of the New York Insurance Commissioner who leveraged her regulatory powers to dissuade insurers from doing business with the National Rifle Association. "Ultimately, the critical takeaway is that the First Amendment

5

prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries." *NRA of Am. v. Vullo*, 602 U.S. 175, 198 (2024). The goals Defendants have expressed here are to only grant access to reporters who can be fired by an intermediary, and who are subjected to editorial control by an intermediary "who can be sued for libel." Defendants expressly state they want the very power—the power to leverage a third-party's control over a speaker—the Supreme Court held violates the First Amendment in *Vullo*. The policy cannot withstand scrutiny.

II.   Defendants' Policy Change Targeted Plaintiffs

Defendants admit that they shifted their policy this year to deny independent journalists press credentials after Defendants became aware that Schott had left the Tribune and formed his own entity. They do not deny the animosity they hold for Schott. They do not argue that there are space limitations that prohibit issuing a pass to him. They do not deny that the policy does not define what an independent journalist is. They do not deny that Schott is a reputable, established journalist who covers Utah politics as a career. They offer no compelling justification for the tightening of the press credentialing policy this year.

Defendants even acknowledge that their policy differs drastically from the White House policy announced this week to encourage independent journalists to seek White House press credentials. *See* Dominick Mastrangelo *"White House to allow seats for 'new media' in briefing room"* The Hill (Jan 28, 2025) http://bit.ly/42BmT3R But they do not attempt to square their policy with the White House

6

acknowledgement that legitimate news coverage now happens on the internet, social media, and podcasts by journalists who only use this media. Defendants mention that the White House received over 7,000 applications in response. But they do not show that they were inundated with credential applications in the years they accepted applications from independent journalists. They don't even document others who were denied.

The only thing that changed between 2025 and the previous years during which the more permissive policies were in effect was that Schott, whose reporting the defendants have demonstrated hostility, started Utah Policial Watch. Defendants' exclusion of Schott was based on the viewpoints he has expressed.

Defendants claim they restricted media credentialing to eliminate discretion. However, administrative convenience is not a legitimate reason to violate First Amendment rights. Additionally, discretion could have been eliminated by allowing individuals who are full time professional journalists access instead of attempting to draw an arbitrary line amongst journalists.

III.     Strict Scrutiny Applies in this Case

The Seventh Circuit's decision in J*ohn K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2021is not the elixir Defendants claim. They argue that *Evers* means strict scrutiny doesn't apply to media access cases. Not true. *Evers* expressly distinguished cases where "the court applied strict scrutiny, not simply because the plaintiffs were members of a free press, but because the press in those cases were being subject to differential treatment, and in the case of the *Arkansas*

7

*Writers' Project*, differential treatment based on content." *Id.* at 613. And of course, here, Defendants admit to content-based discrimination.

Defendants argue that excluding Plaintiffs does not harm them because the information from the excluded events can be obtained in other ways, such as by watching video feeds, or listening to audio recordings, many of which are not even released "live." Defendants completely ignore the importance of being in the room. Reporters are able to see the people involved and what is happening off-camera. They can interact with others present, potentially getting questions answered on the record. "[T]he availability of live streams . . . [does not] sufficiently allay the irreparable harm from a likely constitutional violation." *TGP Communs., Ltd. Liab. Co. v. Sellers*, No. 22-16826, 2022 U.S. App. LEXIS 33641, at *15 (9th Cir. Dec. 5, 2022). And a reporter having to wait until government officials eventually post a recording online falls short of live access.

IV. Defendants Explanation of the Undefined Terms Demonstrates Vagueness

Defendants spend several pages attempting to establish the "obvious" definitions such as "independent media." But it remains far from clear. For example, the Salt Lake Tribune declares itself "Utah's independent voice." *See* https://www.sltrib.com/about-us/. Wikipedia defines "independent media" to be "any media, such as television, newspapers, or Internet-based publications, that is free of influence by government or corporate interests." https://en.wikipedia.org/wiki/Independent_media. As the Tribune is not corporate owned, it would qualify as independent under this definition. Yet, Defendants claim

8

"'independent media" should be read to mean "freelancer." Doc 26, PageID 219. If that is true, then Plaintiffs are not independent media because Schott is not a freelancer. He writes daily for Utah Political Watch where he is employed.

Defendants claim "blog" isn't vague because a dictionary defines blog as "a website that contains online personal reflections, comments, and often hyperlinks, videos, and photographs provided by the writer." *Id*. That is a fair definition of blog, but it does not encompass Utah Political Watch which is a news site that contains breaking news, legislative reporting and analysis, and political analysis. Utah Political Watch describes itself as "an independent source for news on politics and policy in the Beehive State and beyond [created] to bring you timely news and commentary about politics and policy in Utah and beyond to help you understand not only what but why." https://www.utahpoliticalwatch.news/about/ It isn't a blog.

Yet despite this, Defendants have disparaged Schott as a "former journalist" and belittled him as a "blogger."

What's more remarkable, the actual basis for which defendants claim to have rejected Schott's application appears nowhere in the policy itself. There is nothing about requiring a separate editor, nor about having some deep pocketed corporation to sue for libel. To the extent an entity is required, Utah Political Watch, Inc., is a separate entity. Why it does not qualify, defendants do not say.

V.   Equities Require Issuance of a TRO

Defendants claim that "requiring the Legislature to issue a press credential to Schott would open the pressroom doors to anyone who sought access." Doc 26,

9

PageID 222. This statement reveals Defendants are not viewing Plaintiffs' argument in its true light. A professional reporter with decades of experience covering the legislature is not in the same position as just "anyone." Defendants can craft a policy that distinguishes between members of the professional media and the public, instead of drawing a line within the professional media.

The public deserves to have media coverage of their government from strong voices that are not subject to viewpoint- or content-based discrimination. Other than the untrue "opening the floodgates" argument, Defendants make no argument that issuing credentials only to Schott would cause any harm.

VI.   Conclusion

Plaintiffs respectfully request the court find that Defendants likely violated plaintiffs' First Amendment rights, and issue a temporary restraining order barring the defendants from denying press credentials to Plaintiffs.

DATED: February 3, 2025.

**KUNZLER BEAN & ADAMSON, PC**
Robert P. Harrington

**INSTITUTE FOR FREE SPEECH**

*/s/ Charles Miller*
Charles Miller (*pro hac vice*)
Courtney Corbello (*pro hac vice*)

*Attorneys for Plaintiffs Utah Political Watch, Inc., and Bryan Schott*

## CERTIFICATE OF SERVICE

I hereby certify that on Feburary 3 2025, I filed a true and correct copy of the foregoing **PLAINTIFFS' REPLY IN SUPPORT OF TEMPORARY RESTRAINING ORDER** via the Court's electronic filing system, which effectuated service on all parties of record.

*/s/ Charles Miller*
Charles Miller
