Charles Miller (admitted *pro hac vice*)
Courtney Corbello (admitted *pro hac vice*)
**INSTITUTE FOR FREE SPEECH**
1150 Connecticut Ave., NW, Suite 801
Washington, D.C. 20036
Tel: (202) 985-1644
Fax: (202) 301-3399
Email: cmiller@ifs.org
Email: ccorbello@ifs.org

Robert P. Harrington (12541)
**KUNZLER BEAN & ADAMSON, PC**
50 W Broadway, Suite 1000
Salt Lake City, Utah 84101
Telephone: (801) 994-4646
Email: rharrington@kba.law

*Attorneys for Plaintiffs Utah Political Watch, Inc.,
and Bryan Schott*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UTAH POLITICAL WATCH, INC., and BRYAN SCHOTT, <br><br> Plaintiffs, <br><br> v. <br><br> ALEXA MUSSELMAN, Utah House of Representatives Communications Director and Media Liaison Designee; AUNDREA PETERSON, Utah Senate Deputy Chief of Staff and Media Liaison Designee; ABBY OSBORNE, Utah House of Representatives Chief of Staff; and MARK THOMAS, Utah Senate Chief of Staff, in their official and individual capacities; <br><br> Defendants. | **PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** <br><br> **EXPEDITED TREATMENT REQUESTED** <br><br> Case No. 2:25-cv-00050-RJS-CMR <br> Hon. Robert J. Shelby <br> Hon. Cecilia M. Romero |

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES......................................................................................... iv

INTRODUCTION ........................................................................................................1

SPECIFIC RELIEF SOUGHT AND GROUNDS THEREFORE ..........................................2

STATEMENT OF FACTS ..............................................................................................3

ARGUMENT ............................................................................................................14

I.     PLAINTIFFS SEEK A PROHIBITIVE INJUNCTION THAT WOULD RESTORE THE STATUS QUO, NOT A MANDATORY ONE ..................................15

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ..........................17

       A.  The First Amendment protects Plaintiffs' rights to observe and gather information in Utah's Capitol, and to exercise editorial judgment in reporting and commenting on events ....................................17

       B.  Defendants' restrictions fail forum analysis, regardless of whether the State Capitol is a nonpublic or limited public forum .........................20

           1.  *Defendants' restrictions are unreasonable in light of the forum's purpose* ........................................................................22

           2.  *Defendants' restrictions are not viewpoint-neutral* ............................23

       C.  Alternatively, Defendants' restrictions fail strict scrutiny .......................26

       D.  Defendants' policy constitutes a prior restraint ........................................30

       E.  Defendants' policy is vague ......................................................................32

III.   PLAINTIFFS HAVE SUFFERED AND WILL SUFFER IRREPARABLE HARM IF THIS COURT PERMITS DEFENDANTS TO CONTINUE TO DENY THEM THEIR FREE PRESS RIGHTS ....................................................34

IV.    THE PUBLIC INTEREST AND BALANCE OF EQUITIES FAVOR PLAINTIFFS ...........................................................................................35

V.     THIS COURT SHOULD FOREGO THE BOND REQUIREMENT ......................35

CONCLUSION...........................................................................................................36

TABLE OF AUTHORITIES

CASES

*Am. Broad. Cos. v. Cuomo,*
    570 F.2d 1080 (2d Cir. 1977) ............................................................................................... 19

*Anderson v. Cryovac, Inc.,*
    805 F.2d 1 (1st Cir. 1986) ..................................................................................................... 19

*Blue Moon Entm't, LLC v. City of Bates City,*
    441 F.3d 561 (8th Cir. 2006) ............................................................................................... 31

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ...................................................................................................... 17, 26

*Brown v. Entm't Merchs. Ass'n,*
    564 U.S. 786 (2011) ...................................................................................................... 28, 30

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ............................................................................................................. 26

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ...................................................................................................... 30, 31

*Cont'l Oil Co. v. Frontier Ref. Co.,*
    338 F.2d 780 (10th Cir. 1964) ............................................................................................. 36

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
    473 U.S. 788 (1985) ...................................................................................................... 21, 22

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
    269 F.3d 1149 (10th Cir. 2001) ........................................................................................... 16

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................................................. 35

*Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.,*
    434 F. Supp. 3d 1227 (D. Utah 2020) ........................................................................... 15, 17

*Evans v. Fogarty,*
    44 F. App'x 924 (10th Cir. 2002) ........................................................................................ 15

*FCC v. Fox TV Stations, Inc.,*
    567 U.S. 239 (2012) ............................................................................................................. 32

*First Nat'l Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) ............................................................................. 18

*Flamm v. Am. Ass'n of Univ. Women,*
    201 F.3d 144 (2d Cir. 2000) ................................................................ 18

*Forsyth Cty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ...................................................................... 30, 31

*Garcia v. Bd. of Educ.,*
    777 F.2d 1403 (10th Cir. 1985) .......................................................... 19

*Gay Lib v. Univ. of Mo.,*
    558 F.2d 848 (8th Cir. 1977) .............................................................. 30

*Good News Club v. Milford Cent. Sch.,*
    533 U.S. 98 (2001) .............................................................................. 21

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ............................................................................ 32

*Heideman v. S. Salt Lake City,*
    348 F.3d 1182 (10th Cir. 2003) .......................................................... 14

*Hurley v. Irish-American Gay,*
    515 U.S. 557 (1995) ............................................................................ 20

*In re IBP Confidential Bus. Documents Litig.,*
    797 F.2d 632 (8th Cir. 1986) .............................................................. 19

*John K. Maciver Inst. for Pub. Policy, Inc. v. Evers,*
    994 F.3d 602 (7th Cir. 2021) ................................................ 22, 26, 28

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ............................................................................ 32

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
    508 U.S. 384 (1993) ............................................................................ 23

*Make the Rd. by Walking, Inc. v. Turner,*
    378 F.3d 133 (2d Cir. 2004) ................................................................ 21

*McDonough v. Garcia,*
    116 F.4th 1319 (11th Cir. 2024) ........................................................ 21

iv

*McIntyre v. Ohio Elections Comm'n,*
   514 U.S. 334 (1995) ......................................................................................... 18

*Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo,*
   418 U.S. 241 (1974) ......................................................................................... 20

*Ness v. City of Bloomington,*
   11 F.4th 914 (8th Cir. 2021) ........................................................................... 17

*NetChoice, LLC v. Reyes,*
   No. 2:23-cv-00911-RJS-CMR, 2024 U.S. Dist. LEXIS 163294
   (D. Utah Sep. 10, 2024) ........................................................................... passim

*Nken v. Holder,*
   556 U.S. 418 (2009) ......................................................................................... 35

*O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft,*
   389 F.3d 973 (10th Cir. 2004) ......................................................................... 15

*Obsidian Fin. Group, LLC v. Cox,*
   740 F.3d 1284 (9th Cir. 2014) ......................................................................... 18

*Pollak v. Wilson,*
   No. 22-8017, 2022 WL 17958787 (10th Cir. Dec. 27, 2022) ........................... 21

*Pryor v. Sch. Dist. No. 1,*
   99 F.4th 1243 (10th Cir. 2024) ....................................................................... 35

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ................................................................................... 26, 27

*Reno v. ACLU,*
   521 U.S. 844 (1997) ......................................................................................... 32

*Rodgers v. Bryant,*
   942 F.3d 451 (8th Cir. 2019) ........................................................................... 27

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
   515 U.S. 819 (1995) ................................................................................... 23, 27

*Sable Commc'ns of Cal. Inc. v. F.C.C.,*
   492 U.S. 115 (1989) ......................................................................................... 28

*Sherrill v. Knight,*
    569 F.2d 124 (D.C. Cir. 1977) ................................................ 35

*Shuttlesworth v. Birmingham,*
    394 U.S. 147 (1969) .......................................................... 31

Snyder v. Phelps,
    562 U.S. 443 (2011) .......................................................... 18

*Snyder v. Phelps,*
    580 F.3d 206 (4th Cir. 2009) ................................................ 18

*Szymakowski v. Utah High Sch. Activities Ass'n,*
    No. 2:24-cv-00751-RJS, 2025 U.S. Dist. LEXIS 503 (D. Utah Jan. 2, 2025) ........ 14

*Tex. v. Johnson,*
    491 U.S. 397 (1989) .......................................................... 23

*TGP Communs., Ltd. Liab. Co. v. Sellers,*
    No. 22-16826, 2022 U.S. App. LEXIS 33641 (9th Cir. Dec. 5, 2022) ........... 19, 35

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994) .......................................................... 23

*United States v. Williams,*
    553 U.S. 285 (2008) .......................................................... 32

*United Utah Party v. Cox,*
    268 F. Supp. 3d 1227 (D. Utah 2017) ........................................ 36

*Verlo v. Martinez,*
    820 F.3d 1113 (10th Cir. 2016) .............................................. 20

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) .......................................................... 21

## OTHER AUTHORITIES

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
    Federal Practice and Procedure § 2948 (2d ed. 1995) ........................ 15

*About Us*, The City Journal,
    https://www.davisjournal.com/pages/about-us .............................. 12

*About*, Building Salt Lake,
    https://buildingsaltlake.com/about/ ........................................................................ 12

*About*, Utah Policy,
    https://utahpolicy.com/about ................................................................................. 12

*President Adams' X Post*, Dec. 12, 2024,
    https://perma.cc/Q5JN-7ZCX ................................................................................. 9

Schott, Bryan, *Top Utah GOP lawmaker accused of skirting state laws on campaign finance
    disclosures*, Utah Political Watch, http://bit.ly/4fYAYeH .......................................... 9

Schott, Bryan, *Utah House GOP dodges questions on anti-DEI bills during rollout of 2024
    legislative priorities,* Salt Lake Tribune, https://bit.ly/41oVTUh............................... 8

*Sessions*, Utah State Legislature,
    https://bit.ly/4i7DpNB ........................................................................................... 34

RULES

Fed. R. Civ. P. 65(c) ................................................................................................... 24

## INTRODUCTION

Defendants have now denied Plaintiff Bryan Schott press access for the 2025 Utah Legislative Session. Barring this Court's immediate intervention, they will deny him access permanently. Notwithstanding hundreds of articles to his name and years of prior access to the Utah Legislature press areas, Defendants deny Schott the ability to attend the 2025 Utah Legislative Session as a member of the press simply because the leadership disapproves of his viewpoint.

A seasoned, nationally recognized political reporter, Schott has reported on Utah politics and Utah legislative sessions for over 25 years. And from the time the Utah Legislature created a credentialing policy for news media, Schott received credentials every year. But that changed for the 2025 Legislative Session. After Schott left his position as a reporter at the Salt Lake Tribune and ventured out to create his own independent news publication and podcast, Defendants denied his application. Suddenly, Defendants no longer consider Schott − a left-leaning journalist who often reported critically on the right-leaning majority in the Utah legislature − to be "a professional member of the media associated with an established, reputable news organization or publication." Contrary to the pre-2025 policy, Defendants now prohibit journalists for "[b]logs, independent media outlets or freelance media" from obtaining credentials.

From 2013-2019, Schott's independent media status entitled him to media credentials. From 2019-2024, the legislative policy expressly allowed for independent media to be credentialed. During this time, Schott worked for the Tribune. Suddenly, after Schott returned to independent media in 2024, Defendants changed their policy to exclude independent media for the first time. This change is intended to exclude Schott, who appears to be the only person

affected by the change. On top of the policy change, Defendants applied different, unwritten standards to deny him credentials.

Without the First Amendment, government control over information could stifle public discourse and suppress dissent. Allowing government actors to pick and choose which reporters they deem "worthy" to report on their actions contradicts the Framers' undeniable understanding that free and open discussion is the only way in which to avoid authoritative governance. When officials who are the subject of reporting decide who is "worthy," those decisions become based, not on the quality of the journalism nor the extent it uncovers corruption or keeps those in power in check, but on how much those in power approve of the content.

Without the Court's immediate intervention, Defendants' self-serving press corps selection process will continue, and Plaintiffs will be subject to arbitrary, vague and ever shifting criteria − for content- and viewpoint-based reasons − that deny them the ability to news gather and effectively report on the Utah Legislature's actions. Plaintiffs are not the only reporters impacted. Other media will be placed on notice: Report what we want or be excluded. This Court should enjoin Defendants' new, unconstitutional policy.

## SPECIFIC RELIEF SOUGHT AND GROUNDS FOR RELIEF

Plaintiffs move the Court under Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction prohibiting Defendants and their officers, agents, divisions, commissions, and all persons acting under or in concert with them, from withholding press credentials and placement on the legislative press release distribution list from Schott and other journalists on the basis that (1) they write for "[b]logs, independent media or other freelance media;" (2) Defendants do not consider them to be "a professional member of the media associated with an established reputable news organization or publication;" and (3) they "[a]dhere to a professional

code of ethics;" and further enjoining Defendants to restore Schott's press credentials. Plaintiffs further seek an injunction prohibiting Plaintiffs from applying criteria not contained in the written policy.

Expeditious resolution of this MPI is requested because the ongoing 2025 Utah legislative session is set to end March 7, 2025, with the expectation of special sessions occurring thereafter. Additionally, without media credentials, Plaintiffs are excluded from legislative and gubernatorial press conferences and distribution lists.

**STATEMENT OF FACTS**

*Bryan Schott's Reporting and Commentary*

Plaintiff Bryan Schott is the owner, publisher, and primary reporter for Utah Political Watch (sometimes "UPW"), a subscription-based digital newsletter focused on Utah politics. Schott Decl. ¶1. He is also the host of the UPW podcast Special Session, which provides behind-the-scenes reporting on Utah politics and policy. *Id*. ¶9. Schott has been a political news reporter in Utah for over 25 years. *Id*. ¶3.

Schott established Utah Political Watch in September 2024, *id.* ¶10 and incorporated it as an S Corp the following month. *Id*. Schott is a paid employee of UPW. *Id*. Prior to that, Schott was a Political Correspondent for the Salt Lake Tribune, a daily newspaper published in Salt Lake City, Utah, with the largest paid circulation in the state. *Id.* ¶9. At the Salt Lake Tribune, Schott wrote articles regarding local news related to Utah politics and the Utah Legislature. *Id.* Between 2020 and 2024, Schott's byline appeared on 1,201 stories, almost all regarding Utah-based or national politics. *Id.* For more than a decade prior to joining the Tribune, Schott served as managing editor of UtahPolicy.com, an independent web-based news platform, during which time Schott was a credentialed member of the Utah legislative press corps. *Id.* ¶¶6-7. Schott is a

3

long-time member of the Society of Professional Journalists and abides by its code of ethics. *Id.* ¶4.

Since its establishment in September 2024, UPW has consistently grown in reputation and readership. Utah Political Watch allows visitors to sign up for a free daily newsletter covering Utah politics, and to buy a paid subscription for additional content. *Id.* ¶11. The UPW daily newsletter has approximately 1,200 subscribers, 25% of whom pay to receive additional content. *Id.* ¶12. Beyond subscribers, the UPW website garners tens of thousands of pageviews per month. *Id.* ¶13. Top stories can receive 4,000 to 5,000 views each. *Id.* Each episode of the nascent podcast averages between 250 and 300 downloads of each episode of the nascent podcast. *Id.* Schott has over 12,000 followers on TikTok, where he receives on average between 4,500 and 10,000 views per video on Utah Politics. *Id.* ¶14. Over the last 60 days his videos have been viewed more than 214,000 times. *Id.*

UPW is insured by a Media Liability Policy with $2 million per occurrence coverage. *Id.* ¶10. Additionally, UPW has Malissa Morrell officially listed as its editor on its website. *Id.* ¶15 (citing *Staff*, Utah Political Watch, available at: https://www.utahpoliticalwatch.news/staff/). Morrell has served as Schott's editor in an unofficial capacity since at least 2015. *Id.* During that time, she has helped Schott with story selection, improving his stories (grammar, clarity, brevity) and headline writing. *Id.* While she was not often utilized during Schott's tenure with the Tribune, given its team of dedicated editors at that organization, Morrell has played a prominent role in UPW's output since its launch. *Id.* Prior to this litigation, Defendants never notified Plaintiffs that they were denied credentials for lack of an editor, nor did they ask Plaintiffs whether UPW employed an editor. *Id.*

Schott has received numerous awards and public accolades for his work as a journalist. *Id.* ¶17. He's the recipient of several Utah Broadcasters Association Awards, including for Best Feature Story or Program, Best News Reporting in a Series and Best Feature Story or Program. *Id.* In 2022, the Utah Society of Professional Journalists named Schott as the state's Best Newspaper Reporter. *Id.* On June 17, 2024, Schott was one of only 34 journalists nationwide who was granted the National Press Foundation's 2024 Elections Journalism Fellowship. *Id.*

*Defendants' Media Credentialing Policy*

Defendants have utilized a written media credentialing policy since 2018. Exhibit 1. From 2019 through 2024, the policy expressly permitted bloggers and independent media to receive media credentials, albeit after additional scrutiny. The 2019 policy stated "a blog site owner or organization not bound by a code of ethics" could receive a credential upon signing a document agreeing to abide by an ethics code. Exhibit 2. Schott received credentials as a blog site organization representative under the policy in 2018 and 2019. Schott Decl. ¶7.

In 2020 the policy did not mention bloggers or independent media of any kind. *See* Exhibit 3 (2020 Policy). In 2021, the policy was amended to state that "[b]loggers representing a legitimate independent news organization may become credentialed under some circumstances." Exhibit 4 (2021 Policy). That language remained in place in 2022. *See* Exhibit 5 (2022 Policy). In 2023, Defendants edited the above sentence to replace "some circumstances" with "limited, rare circumstances." *See* Exhibit 6 (2023 Policy). That change remained in 2024. *See* Exhibit 7 (2024 Policy).

In November 2024, after Schott had established UPW, Defendants substantially revised their "Utah Capitol Media Access and Credentialing Policy" for controlling media access to the Utah Legislature to – for the first time – completely bar blogs and independent media from

receiving press credentials under any circumstance. *See* Exhibit 8 (2025 Utah Capitol Media

Access and Credentialing Policy, also available at: https://perma.cc/M77N-LWXV); Schott Decl.

¶¶20-24.

The 2025 Credentialing Policy also added the following preamble:

The Utah Capitol Media Credential application process, outlined below, is designed to give professional journalists and media representatives from reputable organizations access to cover the Legislature and other significant events at the Utah State Capitol. This process aims to support informed reporting while maintaining the integrity and security of the Capitol.

Credentialed media members must primarily focus on gathering and reporting news that occurs at the Capitol. Completing an application does not guarantee that a credential will be issued. Having been previously credentialed does not guarantee that a credential will be granted in the future. A Utah Capitol Media Credential is valid for one calendar year*. Organizations may request more than one media credential; however, Senate and House media liaison designees reserve the right to limit the number of credentials allocated to any media organization.

The 2025 Credentialing Policy also reversed course in stating that "[b]logs, independent

media or other freelance media do not qualify for a credential." *Id.*

The 2025 policy provides no definition of "independent media," "reputable news

organization or publication," or any other term. However, through this litigation, Defendants

have stated they changed the credentialing policy to exclude blogs and independent media,

paradoxically, because of "an uptick in nontraditional, independent media." Dkt. 26 at 14 (citing

Peterson Decl. ¶32). In other words, because a larger portion of the media is now

"nontraditional" or "independent," that growing, influential segment of the media would be

excluded.

The 2025 Credentialing Policy also contains five criteria that a journalist must meet to

obtain press credentials: (1) "fill out an online application;" (2) "[b]e a professional member of

the media (which includes journalists, photographers and videographers) who regularly covers

the Legislature and Capitol in person and is part of an established reputable news organization or

publication" (3) "provide an annual background check;" (4) "[a]dhere to a professional code of ethics;" and (5) "[c]omplete the yearly harassment prevention training." Exh. 8; Schott Decl. ¶23. Additionally, if required by a media designee, the credential applicant must "submit a letter of introduction on official publication letterhead" that contains certain information verifying the applicants' employment status and need for credentials. Exh. 8; Schott Decl. ¶26.

The 2025 Credentialing Policy provides that credentialed press are granted access to (1) "some secure areas of the Capitol, such as the press room and designated areas in the Senate and House chambers;" (2) "designated media workspaces in the Senate and House galleries;" (3) "set up in the Senate and House galleries for credentialed videographers and photographers;" (4) "[c]redentialed media may be permitted access to media availabilities and other press events with elected officials;" (5) "designated media parking;" (6) "the Capitol press room, which is equipped with internet access and an audio feed from both chambers;" (7) "designated areas in the galleries of the Senate and House;" and (8) "Committee Rooms." Exh. 8; Schott Decl. ¶28. Finally, as Defendants informed Schott (*see infra*), Defendants have a policy or practice of not distributing legislative press releases to any press that is not credentialed under the 2025 Credentialing Policy. Schott Decl. ¶29.

*Schott's Years of Press-Credentialed Access to the Utah Legislature*

Schott has covered the Utah Legislature since 1999 for various media outlets in Utah. *Id.* ¶18. Schott received press credentials every year that the Utah Legislature issued them. *Id.* ¶19. Until now, the application process was largely a formality. *Id.* Applicants would have to pass a criminal background check by the Utah Highway Patrol and then have a House or Senate staffer sign off on the application. *Id.*

After Schott established UPW in September 2024, he assumed that, in keeping with Defendants' practice over the past decade, that he would again be granted press credentials. *Id.* ¶30. He informed Defendants that he had begun reporting on behalf of UPW soon after its creation and asked for details on the upcoming credential application as well as to be placed on the legislative press release list. *Id.* ¶29. Defendants did not immediately respond but, when later pressed, informed Schott that the legislative press releases are only for credentialed media. *Id.*

*Schott's Reporting Angers Defendants*

In 2024, Schott's reporting on the Utah legislature, and Defendants, was not always favorable. *Id.* ¶35. On January 10, 2024, Schott made a lighthearted X.com post poking a little fun at legislative staffers who had difficulty setting up a backdrop. *Id.* ¶34. Defendant Osborn responded on X.com: "Bryan, you are a dick! As a reporter, I can't believe you think it's okay to blast staff for doing their job. You could have got up and helped, but you chose to just tweet about it. #classless." *Id.*

The backdrop was set up for a House Republican pre-session press conference to lay out their legislative priorities. *Id.* ¶32. Once it started, a reporter from KUTV asked about the effort to ban DEI at state colleges and universities. *Id.* Rep. Katy Hall, the bill's sponsor, was in attendance, but Schultz would not let her speak about the issue. *Id.* Schott wrote an article the next day stating that Schultz dodged questions about the issue. Schott, Bryan, *Utah House GOP dodges questions on anti-DEI bills during rollout of 2024 legislative priorities,* Salt Lake Tribune, https://bit.ly/41oVTUh. Schott received several angry messages from Schultz following publication accusing Schott of bias. One message was to the effect of: "You used to be the best reporter in the Legislature. It's sad how far you've fallen." Schott Dec. ¶33.

On December 12, 2024, reporting for UPW, Schott issued a story that a local nonprofit group had filed a complaint against Senate President Stuart Adams alleging he had violated campaign disclosure laws. *Id.* ¶35; Schott, Bryan, *Top Utah GOP lawmaker accused of skirting state laws on campaign finance disclosures*, Utah Political Watch, http://bit.ly/4fYAYeH. The same day, Senate President Adams took to X.com, labeling Schott a "former media member" and calling the story "part of a troubling pattern of neglectful journalism that undermines the profession's integrity." *President Adams' X Post*, Dec. 12, 2024, https://perma.cc/Q5JN-7ZCX; Schott Decl. ¶36.

Defendant Peterson, Adams' Deputy Chief of Staff, was similarly unhappy with Schott's reporting. Schott Decl. ¶37. Schott had reached out to Peterson via text several hours prior to publishing his story and asked if she had a comment. *Id.*; Exhibit 9. Peterson, responding two hours later, criticized Schott for publishing his story without awaiting her comment as a "lack of professionalism" and "disregard for accurate reporting and ethical standards." *Id.* "This is not the first time this has happened," Peterson wrote, "it's part of a troubling pattern of neglectful journalism." Schott Decl. ¶38; Exh. 9.

Peterson chided Schott for "fail[ing] to obtain information from the Lieutenant Governor's Office." Schott Decl. ¶39; Exh. 9. But, as Schott explained to Peterson, he had already sought comment from the Lieutenant Governor numerous times and asked for clarification prior to publishing his story. *Id.* Schott also explained that he had only learned of the complaint that same day, which accelerated his need to provide a breaking news report. *Id.* He offered to update his story with any comment offered and asked whether Peterson's criticism of his story would lead to his press credential application being denied. *Id.*

9

But Peterson still refused to provide a substantive comment for over five hours from Schott's first request, which, when finally sent, was merely the statement Peterson had previously released to another news organization in the interim, and which Schott had already seen. Schott Decl. ¶40; Exh. 9. Even after sharing that "comment," and while dismissively referring to UPW as a "blog," Peterson continued to accuse Schott of having a "lack of journalistic ethics" and "failing to follow basic journalistic standards" because he had reported on a story that Peterson believed to be "inaccurate" and "unfair." *Id*.

When asked what ethical standards Schott had violated, Peterson responded, "If you have to be told, you aren't a journalist." *Id*. And, regarding the fate of Schott's press credential application, Peterson would only state: "We will follow our policy when reviewing media credential applications." *Id*.

*Defendants Deny Plaintiffs Press Credentials Application*

Five days later, on December 17, 2024, Schott applied for a press credential on the first day applications were accepted. *Id.* ¶43. He passed the background check, and then contacted Alexa Musselman, House Communications Director, regarding his application. *Id.* Musselman told him "We have to look it over for a bit . . . I'm going to go touch base with others, then we'll give you a call." *Id.* Schott responded that he would wait there for a decision. *Id*.

Schott had never received this additional level of scrutiny before. *Id.* ¶44. When he asked Musselman whether the same level of scrutiny was applied to Utah News Dispatch, a month-old organization that had applied for press credentials for the 2024 Legislature and was ultimately issued credentials for several reporters, Musselman responded that, "We did have conversations with them," but said she was on leave from work during that time. *Id.* While Schott waited,

several other applicants walked in and out of Musselman's office and had their applications quickly signed off by Musselman or her designees. *Id*. ¶45.

Schott waited in person for approximately 90 minutes. *Id*. ¶46. Schott then texted Musselman to inquire about the delay. *Id*. Shortly after, Schott received a follow-up email from Musselman and Senate Deputy Chief of Staff Aundrea Peterson informing him that they had rejected his application because "Utah Capitol media credentials are currently not issued to blogs, independent, or other freelance journalists." *Id*.

Schott appealed the decision to deny him press credentials. *Id*. ¶47; Exhibit 10. On December 26, 2024, he received a letter in response from Abby Osborne and Mark Thomas upholding the decision. *Id*.

Neither in the email denying his application, nor in the letter denying his appeal, did Defendants inform Plaintiffs the standards they used to determine that UPW is not "an established, reputable news organization" and is a "[b]log[], independent media outlet[]." Schott Decl. ¶¶43-48; Exh. 10. However, after Schott filed this suit, Defendant Musselman provided the following post hoc reasoning in her declaration: "Schott is not responsible to an editor and is the final arbiter and executioner of his stories, and thus represents his own stream of consciousness." Dkt. 26 at 15 (citing Musselman Decl. ¶4). Musselman also declared that because UPW had only existed for three months, it "did not have any institutional framework or a sufficiently established track record." *Id*. Defendants indicate that "institutional framework" is something that shows "the applicant can be held responsible for actions." *See* Peterson Decl. ¶39 (Doc 27 at 12).

None of this was communicated to Schott prior to Defendants filing their opposition to the TRO motion. Nowhere does the 2025 credentialing policy indicate that it requires a separate

editor, or that Defendants disallow "stream of consciousness" reporting. As to Plaintiffs' lack of an editor, this assertion is untrue. UPW does have an editor that assists in reviewing and editing Schott's work prior to it being published. Schott Decl. ¶15. Additionally, UPW carries Media Liability Insurance, which allows it to "be held responsible for actions." *Id.* ¶10.

Defendants have issued credentials to reporters and interns from fewer than 20 organizations. *See* Exhibit 13; Schott Decl. ¶55. Under the 2025 credentialing policy, Defendants issued media credentials for at least one reporter from a blog and/or independent media outlet, and several depending how "independent media outlet" is defined. *Id.* Specifically, Defendants issued media credentials this year for the first time to a reporter from Building Salt Lake. *Id.* Building Salt Lake describes itself as "locally owned, independent media," and touts that "Building Salt Lake is a nationally recognized Top-100 Urban Planning Blog." *About*, Building Salt Lake, https://buildingsaltlake.com/about/. Thus, Building Salt Lake is both a blog and an independent media outlet. Press Credentials have been issued to reporters from multiple organizations that call themselves independent, including Building Salt Lake, Gephardt Daily, The Salt Lake Tribune, Utah Policy, and Utah News Dispatch. Exh. 13.

In addition, Defendants issued media credentials to Becky Ginos of the Davis Journal. *Id.* Ginos is the editor and sole staff member of the Davis Journal. *About Us*, The City Journal, https://www.davisjournal.com/pages/about-us. Ginos is self-edited, but credentialled. Exh. 13. Defendants also issued a press credential to Holly Richardson, the editor and sole employee of Utah Policy. *Id.* Utah Policy describes itself as a news aggregator. *About*, Utah Policy, https://utahpolicy.com/about. It primarily carries news releases and guest opinions. *Id.* To the extent Utah Policy produces original stories, Holly Richardson would be self-edited.

Accordingly, Defendants do not treat being a blog or being independent as absolute bars to issuing credentials to reporters from other news organizations. Being "self-edited" or subsequently reporting in a "stream of consciousness" due to lack of editing is also not a bar for other journalists who seek credentials from Defendants.

*Schott's Lack of Access During the 2025 Legislative Session*

The 2025 Utah Legislative Session began on January 21, 2025 and Schott has no way of obtaining access to the areas of credentialed access in a manner equal to that of other members of the press. *Id*. ¶59. Defendants denied Schott access to a press conference about the House GOP legislative priorities on January 13, 2024. *Id*. ¶60. And Governor Cox holds monthly press conferences, the first of which took place on the morning of January 16th, which Schott missed. *Id*. Absent intervention by the court, Schott will miss Governor Cox's press conferences for the remainder of the year.

On the first day of session, the Senate President and Speaker of the House delivered opening addresses. *Id*. ¶61 The press, except Schott, were able to report on those addresses from the press area on the floors of the House and Senate. *Id*. The press, other than Schott, were able to attend the media gathering with the Senate President after he delivered his remarks. *Id*. Each day going forward, Schott will miss access to events and newsworthy information that other press members access. *Id*. ¶62. Every press member, except Schott, will be able to view and report on these events from the designated media areas throughout the Capitol and both legislative chambers. *Id*. ¶¶62-63. Every statehouse reporter, besides Schott, will be able to cover meetings, press conferences, press releases, legislative actions and other events that occur in media areas not accessible by the public. *Id*. Those reporters will be able to obtain videos, photographs, and audio recordings as part of their reporting materials that Schott cannot obtain.

13

*Id*. Those reporters will speak to legislators and their staff, witnessed legislative action up close, be given legislative materials and attended impromptu press briefings; Schott will not. *Id*. After the close of this session, there are likely to be special sessions called, from which Schott will also be denied credentialed access. *Id*. ¶64.

It appears, based upon the information provided by Defendants, and the contents of their filings in this case, that no other applicant has been denied credentials for the 2025 legislative year—and certainly none who are similarly situated to Schott.

Schott's harm, and that to his readership and listenership, is occurring now. *Id*. ¶69. And every day from today until the end of the 2025 Legislative Session—if this Court does not intervene—Schott will continue to be obstructed from the same news gathering opportunities as are afforded to his colleagues in the media. *Id*. ¶¶69-71. Defendants' policy and actions impair Schott's ability to gather news.

## ARGUMENT

A Court may grant a preliminary injunction where "(1) the movant will suffer irreparable injury unless the injunction issues; (2) the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). This Court applies a "heightened standard" for a preliminary injunction that "(1) mandates action (rather than prohibiting it), (2) changes the status quo, or (3) grants all the relief that the moving party could expect from a trial win." *Szymakowski v. Utah High Sch. Activities Ass'n*, No. 2:24-cv-00751-RJS, 2025 U.S. Dist. LEXIS 503, at *20 (D. Utah Jan. 2, 2025) (internal citations omitted). The heightened standard does not apply to this request for a prohibitive injunction. *See Equitable*

*Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239 (D. Utah 2020) (explaining heightened standard is applied in action for mandatory injunction that would alter status quo or grant all the relief the moving party could expect from a trial win).

I.   **PLAINTIFFS SEEK A PROHIBITIVE INJUNCTION THAT WOULD RESTORE THE STATUS QUO, NOT A MANDATORY ONE.**

Plaintiffs seek a prohibitive injunction that prevents Defendants from applying their unconstitutional policy against them, not a mandatory injunction. *See, supra*, "SPECIFIC RELIEF SOUGHT AND GROUNDS FOR RELIEF." Specifically, Plaintiffs seek to prohibit Defendants from applying the unconstitutional portions of the 2025 Credentialing Policy against Schott. The other terms would remain in effect, including the constitutional requirements to obtain credentials, and those policies that apply to a credentialed reporter.

The injunction will restore the status quo ante the policy was changed—Schott (likely) qualifying for press credentials, a condition which existed for decades. Relief that "require[s] a party who has recently disturbed the status quo to reverse its actions . . . restores, rather than disturbs, the status quo ante, and is thus not an exception to the rule." *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (*quoting* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)). "'Status quo' does not mean the situation existing at the moment the lawsuit is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.'" *Id.*

A "preliminary injunction in this case [would] not require defendants to do something that they were not doing during the last uncontested period." *Evans v. Fogarty*, 44 F. App'x 924, 928 (10th Cir. 2002). During the last uncontested period, Defendants considered applications from independent reporters on their merits. "In determining the status quo for preliminary

injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001). The reality here is that Schott has had press access to the State Capitol in every year of the 21st Century.

*Dominion* involved a commercial dispute over whether Echostar (Dish Network) had to activate services for Dominion customers. There, "the last uncontested status of the parties was the four years in which EchoStar activated Dominion subscribers regardless of whether the subscriber had met the QRS criteria. Even if EchoStar had the legal right under the contract to refuse activating new, non-QRS Dominion subscribers, the reality was that EchoStar activated Dominion subscribers whether or not they qualified for QRS status." *Id.* The Court was not persuaded by the defendants "contention that the status quo was defined immediately before the action [was] unavailing" because that status was "contested by [the plaintiff]" and "the impetus for [the] litigation." *Id.* Further, the Court reasoned that "adopting [defendant's] position would imply that any party opposing a preliminary injunction could create a new status quo immediately preceding the litigation merely by changing its conduct toward the adverse party," which "would unilaterally empower the party opposing the injunction to impose a heightened burden on the party seeking the injunction." *Id*.

Here, the last uncontested status of the parties is not, as Defendants suggest (Dkt. 26 at 40), the time at which Schott's credentials were revoked, because Schott contests that status. The last uncontested status existed when Schott was credentialed to report from the Capitol, throughout the entire decade or more that Utah had used credentials. Also, for years prior to now, independent media were able to receive credentials. Plaintiffs seek a prohibitive injunction that would restore that status.

Finally, the injunction is one that, if Plaintiffs do not succeed on the merits, can be easily undone—Defendants will just effectuate their policy once again. As this Court has said: "[I]f the court 'probably can put the toothpaste back in the tube,' then the heightened standard does not apply." *Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d at 1239 (internal citations omitted).

## II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs bring this First Amendment suit under 42 U.S.C. § 1983[1] to challenge Defendants' Media Credentialing Policy, which governs media access to designated press areas within the Utah State Capitol.

### A.  The First Amendment protects Plaintiffs' rights to observe and gather information in Utah's Capitol, and to exercise editorial judgment in reporting and commenting on events.

The Supreme Court has long recognized a First Amendment right to news gather. *Branzburg v. Hayes*, 408 U.S. 665, 728 (1972). News gathering is "entitled to First Amendment protection because [it is] an important stage of the speech process that ends with the dissemination of information about a public controversy." *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021) (citation omitted). Without "protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg*, 408 U.S. at 681.

Defendants have asserted they are within the bounds of the First Amendment by "[d]enying credentials to bloggers and other independent media" so they can "reasonably ensure[] professional journalists and established media maintain sufficient access." Dkt. 26 at 25. But freedom of press belongs to every journalist, not just those who work for "established"

---

[1] "By the plain terms of § 1983, two – and only two – allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The second factor is not in dispute. Defendants are state actors. As to the first factor, this brief thoroughly discusses Defendants deprivation of Plaintiffs' First Amendment rights.

corporate-owned news organizations with deep pockets and multiple stages of editorial review. "When the Framers thought of the press, they did not envision the large, corporate newspaper and television establishments of our modern world. Instead, they employed the term 'the press' to refer to the many independent printers who circulated small newspapers or published writers' pamphlets for a fee." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 360 (1995) (Thomas, J., concurring). The Supreme Court has long recognized that "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978); *Branzburg*, 408 U.S. at 705 ("informative function" of the "organized press . . . is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists"). The recent resurgence in independent media brings us closer to the press environment the founders experienced and protected.

Lower courts have also understood that the extent of a journalist's free press rights is not based on whether they write for an independent or mainstream media organization. *See, e.g., Obsidian Fin. Group, LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) ("The protections of the First Amendment do not turn on whether the defendant was a trained journalist, formally affiliated with traditional news entities, engaged in conflict-of-interest disclosure, went beyond just assembling others' writings, or tried to get both sides of a story."); *Snyder v. Phelps*, 580 F.3d 206, 219 n.13 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) ("Any effort to justify a media/nonmedia distinction rests on unstable ground, given the difficulty of defining with precision who belongs to the 'media.'"); *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 149 (2d Cir. 2000) ("a distinction drawn according to whether the defendant is a member of the media or not is untenable"); *In re IBP Confidential Bus. Documents Litig.*, 797 F.2d 632, 642

(8th Cir. 1986) ("To recognize the existence of a First Amendment right and yet distinguish the level of protection accorded that right based on the type of entity involved would be incompatible with the fundamental first amendment principle that [the value of speech is not speaker dependent]") (citation omitted); *Garcia v. Bd. of Educ.*, 777 F.2d 1403, 1410 (10th Cir. 1985) ("First Amendment protection should not depend on whether the criticism is in the form of speech by a private individual or publication by the institutional press.").

Thus, all members of the media have an equal right to news gather regardless of the amount of financial backers or corporate oversight they have. While that right is not absolute, it does exist "once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media, or the rights of the First Amendment would no longer be tenable." *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977). Reporters should "not only be given equal access, but within reasonable limits, access with equal convenience to official news sources." *Westinghouse Broad. Co. Inc. v. Dukakis*, 409 F. Supp. 895, 896 (D. Mass. 1976).

Segregating media seating or press briefings into "preferred" and "unpreferred" viewing sections is not equal access and is unconstitutional. *See TGP Communs., Ltd. Liab. Co. v. Sellers*, No. 22-16826, 2022 U.S. App. LEXIS 33641, at *15 (9th Cir. Dec. 5, 2022). This is because the "granting favorable treatment to certain members of the media. . . allows the government to influence the type of substantive media coverage that public events will receive." *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986).

Moreover, the First Amendment right to report news includes the right to exercise independent editorial judgment. This Court has recently noted that "[t]he Supreme Court has long held that an entity exercising editorial discretion in the selection and presentation of content

is engaged in speech activity protected by the First Amendment." *NetChoice, LLC v. Reyes*, No. 2:23-cv-00911-RJS-CMR, 2024 U.S. Dist. LEXIS 163294, at *22 (D. Utah Sep. 10, 2024) (internal quotations and citations omitted). "A private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley v. Irish-American Gay*, 515 U.S. 557, 569-70 (1995). The Supreme Court "held that 'the choice of material . . . and the decisions made as to limitations on the size and content . . . and treatment of public issues . . .- whether fair or unfair-constitute the exercise of editorial control and judgment' upon which the State cannot intrude." *Id*. at 575 (internal quotation marks omitted). The term 'editorial discretion' is a derivative of 'journalistic discretion,' *See e.g.*, *Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241, 261 (1974) ("the elementary First Amendment proposition [is] that government may not force a newspaper to print copy which, in its journalistic discretion, it chooses to leave on the newsroom floor.") The term should not be misread to require editorial staff for press rights to apply.

The choice to include or exclude an editor in the writing process or write in a "stream of consciousness" style is no different than other choices that may be made while exercising journalistic discretion.

**B.  Defendants' restrictions fail forum analysis, regardless of whether the State Capitol is a nonpublic or limited public forum.**

"To determine when and to what extent the Government may properly limit expressive activity on its property, the Supreme Court has adopted a range of constitutional protections that varies depending on the nature of the government property, or forum." *Verlo v. Martinez*, 820 F.3d 1113, 1129 (10th Cir. 2016). "The Supreme Court has sorted government property into the following categories: traditional public forums, designated public forums, limited public forums,

and nonpublic forums." *Pollak v. Wilson*, No. 22-8017, 2022 WL 17958787, at *1 (10th Cir. Dec. 27, 2022) (unpublished) (brackets and internal quotation marks omitted). To be sure, Plaintiffs' primary expression occurs online, not in the Utah statehouse. But because Plaintiffs' First Amendment-protected news gathering function occurs on public property, the regulation of which is at issue, forum analysis may well be required.

A limited public forum "exists where a government has reserved a forum for certain groups or for the discussion of certain topics." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (brackets and internal quotation marks omitted). When a forum is "generally available for the discussion of certain topics" and open to the public, "it is a limited public forum." *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 145 (2d Cir. 2004).

The media spaces at issue in this case are limited public fora. Defendants appear to agree, although they also posit that the forums could be considered "nonpublic." Dkt. 26 at 23. Not so. Nonpublic forums exist "[w]here the government is acting as a proprietor, managing its internal operations." *Walker*, 576 U.S. at 216. Here the Utah Legislature is opening its meetings, committee hearings, workspaces, and press room for comment on a specific subject matter by the public, including the press. Exh. 8 at 3.

Ultimately, however, the distinction makes no difference. In both nonpublic and limited public fora, regulations must be reasonable in light of the forum's purpose and viewpoint-neutral. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (nonpublic forum); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001) (limited public forum); *see also McDonough v. Garcia*, 116 F.4th 1319, 1322-25 (11th Cir. 2024)

(detailing evolution of Supreme Court's forum analysis). The challenged restrictions fail forum analysis on both prongs.

### 1.    *The restrictions are unreasonable in light of the forum's purpose*

The reasonableness of a restriction "must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809. Defendants have not identified any space constraints (fewer than twenty organizations have credentialed staff), or security concerns that make it reasonable to impose the credentialing criteria that they do. This is precisely why *John K. Maciver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 610 (7th Cir. 2021) is inapposite. There, the forum at issue was closed door, off-the-record meetings the Governor held with selected reporters. *Id*. The Seventh Circuit panel deemed them to be nonpublic based on their off-the-record nature. *Id*. As the Court explained it, the Governor excluded the plaintiff journalists from "an event that is not open to the public and not held on government property dedicated to open communication." *Id*. There were also "space constraints and security concerns" proven by the record. *Id*. Based on these facts, as well as the content-neutral criteria used by the Governor, it was reasonable for the plaintiff journalists to be excluded. *Id*.

Defendants' given reason for the policy—to "eliminate discretion"—is unavailing. Their policy remains full of discretionary decisions Defendants can make such as what a "blog" or "independent" media even is, how a journalist "adheres to a professional code of ethics" or what makes a journalist "reputable" or a part of "established" media. That independent media is ascendant is a reason to welcome, not exclude it. Moreover, because Defendants are not up against space constraints, there is no justification to "eliminate discretion" in a way that reduces access to professional press.

2.   *The restrictions are not viewpoint-neutral*

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Tex. v. Johnson*, 491 U.S. 397, 414 (1989). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or *perspective* of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va*., 515 U.S. 819, 829 (1995) (emphasis added). The government cannot "den[y] access to a speaker solely to suppress the point of view he espouses." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist*., 508 U.S. 384, 393 (1993) (quotation and citation omitted).

Defendants' viewpoint-based discriminatory motives for denying Plaintiffs' credentials are clear in several ways. First, as explained, supra, Defendants' post-hoc complaints that Plaintiffs do not have an editor, or their reporting is a "stream of consciousness" indicates that Defendants have denied Plaintiffs' credentials based on their use of editorial discretion to present their news pieces in a particular way. Dkt. 26 at 15 (citing Musselman Decl. ¶4). By "exercising editorial discretion" journalists "seek to communicate messages on a wide variety of topics and in a wide variety of formats." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 636 (1994). Defendants' policy ensures that Plaintiffs are completely barred from being able to communicate their messages and views in the manner and form they want to. This is viewpoint discrimination.

Moreover, viewpoint discrimination is clear given that Defendants made no efforts to determine whether the reasons they proffer in their declarations were applicable before denying Schott's application. To be sure, they were not valid. Defendants did not inquire whether UPW had an editor. Schott Decl. ¶15. Had they done so, Schott would have notified them that UPW employs Malissa Morrell to review his work. *Id*. She assists in story selection, improving the

grammar, clarity and brevity of articles, and in headline writing. *Id.* Defendants also did not inquire about Schott's writing process before deeming all current and future UPW reporting to be done in a "stream of consciousness" style. *Id.* ¶16. Had they made the effort to do so, Schott would have informed them of the in-depth reporting processes he utilizes to put stories together, many of which take days or weeks to build and include input from multiple sources and are not stream of conscious writings. *Id.* Defendants' failure to inquire or validate their post-litigation reasons before denying Schott's application indicates these reasons are merely pretext to discriminate against Plaintiffs for their viewpoints.

Other facts surrounding Defendants' denial of Plaintiffs' press credentials further point to viewpoint discrimination. Prior to this legislative session, Schott easily obtained press credentials since the policy was first established. Schott Decl. ¶30. But Schott's reporting on the majority-Republican legislature was not always favorable and in early 2024, Defendants and their colleagues put Schott on notice that he fell out of favor of the legislature. Once Schott left the safety of a large news organization and established his own independent news site, Defendants quickly altered their policy to ensure independent journalists were not allowed credentials. Exh. 7; Exh. 8; Schott Decl. ¶¶20-24. And this policy change appears to only impact Plaintiffs.

Moreover, only five days before Schott applied for credentials, Senate President Adams criticized him, expressing anger about Schott's reporting on Adams' campaign finance disclosure. Schott Decl. ¶¶35-36. And Defendant Peterson followed closely along, using language that was notably consistent with the 2025 Credentialing Policy to accuse Plaintiffs of wrongdoing, including "lack of professionalism," "disregard for accurate reporting and ethical standards," and being merely a "blog." Exh. 9; Schott Decl. ¶¶37-40.

It was only five days later that Peterson and the other Defendants denied Schott press credentials. Suddenly, Schott – after over 25 years of journalism, journalistic awards and years of obtaining press credentials – was once again an "independent" journalist for a "blog" who was no longer recognized as a "professional member of the media associated with an established, reputable news organization." Exh. 10; Schott Decl. ¶¶43-48. Then, post-litigation, Defendants reasoned that Plaintiffs were properly excluded for not having an editor and having a "stream of consciousness" style of reporting. Dkt. 26 at 15 (citing Musselman Decl. ¶4).

These instances make clear that those in power dislike the focus, editorial slant, and techniques Plaintiffs use to report on the legislature. But they cannot deny Plaintiffs' importance and relevance as a member of the media when they respond to Plaintiffs' stories so strongly, immediately, and passionately, both publicly and privately.

The open hostility and stonewalling evidence clear viewpoint discrimination. Defendants did not like Plaintiffs' "pattern" of prior coverage of the majority of the Utah Legislature and are punishing Plaintiffs as a result. Other than insisting Plaintiffs no longer meet credential policy criteria, none of the Defendants provided Plaintiffs any explanation as to why they were denied access to the media areas of the 2025 Legislative Session despite years of prior access, or steps that could be taken to remedy the situation. Schott Decl. ¶43-48; Exh. 10.

Defendants have not treated other news media in this way when they apply for credentials as "independent" media. Schott Decl. ¶¶50-58; Exh. 12; Exh. 13. Utah News Dispatch, for example, launched just days before the 2024 session started, yet all of its staff were credentialed for the 2024 session. Schott Decl. ¶58. Utah Policy received credentials for the 2025 legislative session, and their organization consists of one full-time employee/editor and interns. Exh. 13. The Davis Journal also has one employee/editor, and it, too, received 2025 credentials. *Id.* The

Salt Lake Tribune has received credentials for its journalists for the 2025 Legislative Session despite proudly stating it is an "independent" news organization. *Id*. The Daily Utah Chronicle also purports to be "independent" news and is run entirely by a staff of college students at the University of Utah, including its editor. *Id*. Plaintiffs do not question their repute as journalists, but it stands to reason that Schott, with his 25 years of experience and decade as a legislative press credential holder, would also be considered reputable if Defendants metrics were consistently applied. This shows arbitrary application of the policies and points to pretext.

### C.  Alternatively, Defendants' restrictions fail strict scrutiny.

 Of course, "[t]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684. And so, "reporters are not cloaked with automatic 'strict scrutiny protection' merely because they are members of the press." *Evers*, 994 F.3d at 612. But once the state denies press credentials for content- or viewpoint-based reasons, strict scrutiny applies. *See id*. at 613 (distinguishing from cases where "the court applied strict scrutiny, not simply because the plaintiffs were members of a free press, but because the press in those cases were being subject to differential treatment," including "differential treatment based on content.").

Defendants' policy, which distinguishes between speakers based on the content and editorial decisions in their reporting, is content based. The Supreme Court has urged courts to recognized that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). When the Government applies a policy that "identifies certain preferred speakers" – such as "established" media journalists versus bloggers − it commits "a constitutional wrong." *Id*. Such a policy "draws distinctions based on the message a speaker conveys[,]" even if not "obvious" at first blush. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). While some policies "define

regulated speech by particular subject matter, . . . others are more subtle, defining regulated speech by its function or purpose." *Id*. Regardless, though, "[b]oth are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id*.

Defendants' policy is content- and viewpoint-based. By prohibiting "independent" journalists and "bloggers" from the State Capitol but allowing other corporate, "established" media in, Defendants make a clear distinction based on the function and purpose of each journalist's reporting. Those who function without an editor or in a "stream of consciousness" reporting style are banned. Those who serve the purpose of reporting on behalf of an independent or blog media source are banned. That is content and viewpoint discrimination.

Content-based restrictions are subject to strict scrutiny, which "requires a state to show that its law is narrowly tailored to serve a compelling interest." *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019). And the First Amendment provides even stronger protection against viewpoint discrimination, which is "an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. Because Defendants' policy is content- and viewpoint-based, it is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reyes*, 2024 U.S. Dist. LEXIS 163294, at *28 (quoting *Reed*, 576 U.S. at 163). Defendants bear the burden of meeting this "demanding standard." *Id*.

Defendants may assert they do not have to meet strict scrutiny based on Plaintiffs' right to newsgather being violated but they would misunderstand case law to do so. Although, in *Evers*, the Court stated "reporters are not cloaked with automatic "strict scrutiny protection" merely because they are members of the press" it in no way rejected Plaintiffs' position: that once the state is rejecting press credentials for viewpoint-based reasons, strict scrutiny is applied.

994 F.3d at 612. The Court, in fact, explained this distinction. *See id*. at 613 (distinguishing from cases where "the court applied strict scrutiny, not simply because the plaintiffs were members of a free press, but because the press in those cases were being subject to differential treatment, and in the case of the Arkansas Writers' Project, differential treatment based on content.").

To survive strict scrutiny, Defendants must "articulate a compelling government interest warranting the [policy's] intrusion on [Plaintiffs'] First Amendment rights." *Reyes*, 2024 U.S. Dist. LEXIS 163294, at *28. They cannot do so. Defendants lack a compelling state interest justifying the challenged policy's enforcement. Defendants acknowledge their exclusion of certain categories of journalists, but they never "specifically identify an 'actual problem' in need of solving." *Id*. (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)). At most, Defendants simply say they wanted to eliminate "discretion" by their media designees but never explain why that discretion was an issue or how the policy eliminates that discretion. Dkt. 26 at 26. And, aside from this claim, Defendants make no effort to discuss why "independent" or "blogger" journalist without an editor or who reports in a "stream of consciousness" are causally connected to any issues the legislature or Defendants are having regarding press credentials. *See id.* Defendants do not allege that the policy corrects a space, security or other problem, nor can they.

Even assuming the existence of an "'actual problem in need of solving,' the [policy] fails strict scrutiny because Defendants have not shown it is 'carefully tailored to achieve those ends.'" *Reyes*, 2024 U.S. Dist. LEXIS 163294 at *34 (quoting *Sable Commc'ns of Cal. Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)). First, Defendants have no way of showing that a complete barring of "independent" media and "blogs" or those they deem to not be "reputable" is the least restrictive means to accomplish whatever post-hoc problem they identify. As Defendants admit,

their policy differed significantly for years prior to their November 2024 policy change, and they allowed both Schott and independent journalists to be credentialled. Dkt. 26 at 12-14, 28-29. Thus, there are clearly alternative ways to structure their policy so that the "problems" they have can be resolved without infringing on First Amendment rights.

Second, the policy is "underinclusive or overinclusive" when judged against any State interest. *See Reyes*, 2024 U.S. Dist. LEXIS 163294 at *35. It is overinclusive in that it bars *all* media that is independent or a blog regardless of any other criteria met. Independent journalism has such a growing influence and role in news media that the White House has created seats in its press room just to accommodate them. And influential blogs and independent journalists abound in this country – Law360, The Gateway Pundit, Daily Wire, The Volokh Conspiracy, Ben Shapiro, Matt Walsh, Tucker Carlson, Taegan Goddard, and Candace Owens, to name a few. But, based on Defendants' policy, they would *all* be denied the ability to hold a press credential in the Utah State Capitol building. Certainly, Defendants cannot identify a problem that would warrant barring entire categories of media personnel.

The policy is also potentially underinclusive if Defendants' claim of requiring "less discretion" is to be believed. Dkt. 26 at 14. If Defendants were truly concerned about the use of discretion when granting press credentials, they would not permit their media designees to determine whether journalists were "established" or "reputable" or ""adher[ing] to a professional code of ethics." But they do. Thus, any claims that the policy serves to *eliminate any discretion*" to solve a problem is belied by how much discretion remains in the policy itself. Additionally, the policy does not prohibit credentialed media from conducting "stream-of-consciousness" reporting through social media posts or otherwise.

Thus, the over- and underinclusive nature of this policy should cause the Court to do as it has before: have "serious doubts about whether the government [was] in fact pursing the interest it invoke[d], rather than disfavoring a particular speaker or viewpoint." *Reyes*, 2024 U.S. Dist. LEXIS 163294 at *35 (quoting *Brown*, 564 U.S. at 802).

Given this combination of shortcomings Defendants cannot meet their burden. This Court should determine Defendants' policy fails strict scrutiny and Plaintiffs are likely to prevail.

### D. Defendants' policy constitutes a prior restraint.

To facially challenge a credentialing policy as an unlawful prior restraint, a plaintiff must demonstrate that the policy "vests unbridled discretion in a government official over whether to permit or deny expressive activity[.]" *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 755-56 (1988). "The Supreme Court has long adhered to the principle that any system of prior restraint of expression bears a heavy presumption against its constitutional validity." *Gay Lib v. Univ. of Mo.*, 558 F.2d 848, 855 n.14 (8th Cir. 1977) (collecting cases).

Unbridled discretion poses significant risks. First, "[i]f the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion, by the licensing authority, the danger of censorship . . . is too great[.]" *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (internal citations and quotations omitted). Second, "the absence of express standards makes it difficult to distinguish . . . between a licensor's legitimate denial of a permit and its illegitimate use of censorial power." *Lakewood*, 486 U.S. at 758. Thus, a facial challenge based on unbridled discretion can be successful so long as the challenged policy "ha[s] a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id*. at 759.

To curtail the risks identified by the Supreme Court, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license" must contain "narrow, objective,

and definite standards to guide the licensing authority." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-151 (1969). If, after considering the government's "authoritative constructions of the ordinance, including its own implementation and interpretation of it," *Forsyth Cty.*, 505 U.S. at 131, a court determines the licensing scheme "vest[s] unbridled discretion in the hands of a government official," it must be held unconstitutional. *Blue Moon Entm't, LLC v. City of Bates City*, 441 F.3d 561, 565 (8th Cir. 2006).

It is undeniable that the legislative press credential has a "nexus to expression" such that its regulation "pose[s] a real and substantial threat of . . . censorship risks." *Lakewood*, 486 U.S. at 759. As explained above, Plaintiffs engage in expressive activities protected under the First Amendment when they news gather and exercise editorial discretion; those arguments are incorporated herein. *See, supra*, Sections II.A.

Neither the credential policy itself, nor Defendants' application of it, contains narrow, objective, and definite standards. As the policy reads, credentials will only be given to a reporter whom the legislature deems "professional member of the media" who "is part of an established reputable news organization or publication." Exh. 8. The policy does not explain how "professionalism" is measured and how to determine the validity of one's "repute." *Id*. The policy demands applicants meet other subjective, undefined standards like being a "blog," "independent" or "adher[ing] to a professional code of ethics." *Id*. In sum, there are no "express standards" that Defendants must employ, which makes it "difficult to distinguish" between a "legitimate" denial of a press credential and the "illegitimate abuse of censorial power." *Lakewood*, 486 U.S. at 758.

These arbitrary standards leave Defendants with unbridled discretion. Pre-litigation, the only reasons Defendants gave Plaintiffs for denying their press credentials was that they were not

"a professional member of the media associated with an established, reputable news organization or publication" and they were a "blog" or "independent media." Post litigation, they now claim the problem lies with Plaintiffs engage in "stream of consciousness" reporting, lack an additional editor and aren't dependent on a "nationally established media group." Dkt. 26 at 27-28 (citing Peterson Decl. ¶20), 32 (citing Peterson Decl. ¶52). In other words, Defendants' authority to enforce the policy is so untethered by any standards within the policy that, even if those standards were narrow and definite – they are not − they obviously do not base their decision to deny a press application on them. Defendants' self-created, unexplained criteria make it impossible to determine whether they deny applications for legitimate or impermissible reasons and, thus, their policy constitutes a prior restraint.

### E. Defendants' policy is vague.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A policy is impermissibly vague if it (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (internal citations and quotations omitted). And the Supreme Court is particularly sensitive to laws that are vague due to the lack of guiding standards or the potential for arbitrary enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). Lack of notice and arbitrary enforcement are concerns because of the "obvious chilling effect on speech" they create. *Reno v. ACLU*, 521 U.S. 844, 872 (1997).

Defendants' policy, and their own interpretation of the policy, uses several unconstitutionally vague criteria to justify the denial of press credentials. *See* Exh. 8. The policy's limitations of credentials to those who report for "an established reputable news organization or publication," "[a]dhere to a professional code of ethics" and are not "[b]logs, independent media or other freelance media," are not clearly defined. *Id.* Defendants can readily modify what it means to be "established," "reputable," "a blog," "freelance" or "independent" to fit their own motivations. And Defendants never indicate what "ethics" they are policing journalists' adherence to.

Moreover, what qualifies as a publication that is "established" or "reputable" is often in the eye of the consumer, and the entire public has access to publications distributed by ordinary channels, such as broadcast radio and the internet. It is also unclear what may count as "independent" media, particularly given that few news organizations openly characterize themselves as "non-independent" or "partisan."

Nor is it clear how "freelance" journalists are meant to be defined since many journalists can report as a "freelancer" for one publication while also being regularly employed by another publication. Finally, it is unclear what qualifies as a "blog" and whether it is only journalists who report exclusively on a "blog," as opposed to in conjunction with other media formats, cannot have credentials.

It is inexplicable how Defendants have permitted other "independent," "reputable" journalists to obtain press credentials at the same time the denied Schott's application. *See* Exh. 13. This policy is intentionally, and unconstitutionally, vague, which allows Defendants to apply their policy against Schott in a way that deprives him of proper notice of how to comply and chills his speech.

### III.    PLAINTIFFS HAVE SUFFERED AND WILL SUFFER IRREPARABLE HARM IF THIS COURT PERMITS DEFENDANTS TO CONTINUE TO DENY THEM THEIR FREE PRESS RIGHTS.

Plaintiffs have been, and will continue to be, irreparably harmed by Defendants' arbitrary and discriminatory denial of press credentials. The Utah Legislative Session began on January 21, 2025. Schott Decl. ¶59. Schott has already missed the press conference about the House GOP legislative priorities on January 13th. *Id*. ¶60. Additionally, Governor Cox holds a monthly press conference for credentialed media, the first of which occurred on January 16th, that Schott cannot attend in person or ask questions. *Id*. On the day the session started, numerous statehouse reporters, besides Schott, were able to cover the opening addresses by the Senate President and Speaker of the House from a position of privileged access. *Id*. ¶61.

As the session goes on, media members, except Schott, will be able to report on legislative actions, press releases, speeches, impromptu press conferences, statements to the press, and other events that occur in media areas of the Capitol, including obtaining the necessary photos, audio, or video. *Id*. ¶62. Defendants will continue to deny Schott entry to the daily meetings with Senate leadership in the Senate President's office, media availabilities with the Speaker of the House, and House or Senate rules committee meetings. *Id*. Schott has already missed several legislative press releases, and, given his lack of credentials, will miss many more. *Id.* ¶60.

The 2025 Legislative Session continues until March 7, 2025, and special sessions can occur thereafter. *Id*. ¶50. In fact, the Utah Legislature has had one or more special sessions every year since 2001 except for 2014. *Sessions*, Utah State Legislature, https://bit.ly/4i7DpNB. Each day that Defendants deny Schott access is a day Plaintiffs' readers are denied complete news coverage. *Id*. Thus, if this Court does not act immediately, Defendants will continue to deprive

Plaintiffs of the ability to news gather in a manner equal to that granted to other statehouse reporters for the entire legislative session, including special sessions. *Id.*

This Court cannot grant access retrospectively. This viewpoint discrimination as to in-person access to such areas designated for the news media is not a de minimis injury. *TGP Communs.*, 2022 U.S. App. LEXIS 33641, at *16. The Supreme Court has acknowledged that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

### IV.    THE PUBLIC INTEREST AND BALANCE OF EQUITIES FAVOR PLAINTIFFS[2]

The balance of harms favors Plaintiffs, and a MPI serves the public interest. On the one hand, Plaintiffs face the prospect of continued unconstitutional exclusion in violation of the First Amendment. On the other hand, allowing Plaintiffs access imposes no discernible harm on Defendants, aside from those typically associated with free speech and press.

And "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024) (internal quotation marks omitted). It is "[n]ot only newsmen and the publications for which they write, but also the public at large [that] have an interest protected by the [F]irst [A]mendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977).

### V.    THIS COURT SHOULD FOREGO THE BOND REQUIREMENT

Under Fed. R. Civ. P. 65(c), "the trial judge has wide discretion in the matter of requiring security and if there is an absence of proof showing a likelihood of harm, certainly no bond is

---

[2] The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

necessary." *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964). Where an injunction issues that "enforces fundamental constitutional rights against the government[,] [w]aiving the security requirement best accomplishes the purposes of Rule 65(c)." *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1260 (D. Utah 2017). A bond requirement would negatively impact Plaintiffs' rights by requiring them to pay a fee to engage in free speech and free press. It would also negatively impact the rights of the public to be free from government enforcement of unconstitutional policies. And an injunction requiring Defendants to respect the First Amendment would not harm them. Thus, no bond should be required here.

CONCLUSION

This Court should grant Plaintiffs' motion for preliminary injunction immediately prohibiting Defendants from denying Plaintiffs press credentials based on the status of Schott or UPW being independent, a blog, unedited, not reputable or not sufficiently established.

DATED: February 26, 2025.

INSTITUTE FOR FREE SPEECH
*/s/ Charles Miller*
Charles Miller (admitted *pro hac vice*)
Courtney Corbello (admitted *pro hac vice*)

KUNZLER BEAN & ADAMSON, PC
Robert P. Harrington

*Attorneys for Plaintiffs Utah Political Watch, Inc., and Bryan Schott*

## <u>CERTIFICATE OF WORD LIMIT COMPLIANCE</u>

I hereby certify that the foregoing **PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**, including footnotes, but exclusive of caption, signature block, certificate of service, and word-count certification, contains 10,989 words, as tracked by Microsoft Word and is in compliance with the Court's order granting an overlength motion of 40-pages or 12,400-words (Dkt. 35).

*/s/ Charles Miller*
Charles Miller
