Tyler Green, Utah Bar No. 10660
Consovoy McCarthy PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
*Counsel for Defendants Alexa Musselman,*
*Aundrea Peterson, Abby Osborne, and*
*Mark Thomas*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| UTAH POLITICAL WATCH, INC., and BRYAN SCHOTT, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALEXA MUSSELMAN, Utah House of Representatives Communications Director and Media Liaison Designee; AUNDREA PETERSON, Utah Senate Deputy Chief of Staff and Media Liaison Designee; ABBY OSBORNE, Utah House of Representatives Chief of Staff; and MARK THOMAS, Utah Senate Chief of Staff, in their official and individual capacities; <br><br> *Defendants.* | Case No. 2:25-cv-00050-RJS-CMR <br><br> Hon. Robert J. Shelby <br> Hon. Cecilia M. Romero |

## <u>Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

MOTION ................................................................................................................. 1

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    A.   Access to the Legislature and the media credentialing policy ...................... 2

    B.   The denial of Schott's application for a 2025 media credential .................... 4

    C.   Procedural history ......................................................................................... 6

LEGAL STANDARD ............................................................................................. 7

ARGUMENT ........................................................................................................... 8

    I.    Plaintiffs fail to plausibly plead a First Amendment violation under public forum doctrine (Counts I, II). ............................................ 8

        A.   Plaintiffs have not shown a protected First Amendment right of newsgathering or equal access. ........................................... 9

        B.   The credentialing policy satisfies the requisite standard. ............. 15

            1.   The credentialing policy is reasonable considering the forum's purpose. ......................................................... 16

            2.   The credentialing policy is viewpoint neutral. ..................... 19

    II.   Plaintiffs fail to plausibly plead retaliation (Count III). .................... 25

    III.  Plaintiffs' prior-restraint claim fails (Count IV). ................................ 27

    IV.  Plaintiffs' void-for-vagueness claim fails (Count V). ......................... 28

CONCLUSION ...................................................................................................... 32

WORD COUNT CERTIFICATION ...................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................7

*Ateba v. Jean-Pierre,*
706 F. Supp. 3d 63 (D.D.C. 2023) .......................................... 16-18, 23, 27, 30

*Balt. Sun Co. v. Ehrlich,*
437 F.3d 410 (4th Cir. 2006) ...................................................................14, 26

*Beckles v. United States,*
580 U.S. 256 (2017) ...................................................................................... 29

*Boutilier v. INS,*
387 U.S. 118 (1967) ...................................................................................... 29

*Bralley v. Albuquerque Pub. Sch. Bd. of Educ.,*
2015 WL 13666482 (D.N.M. Feb. 25) ......................................................27-28

*Branzburg v. Hayes,*
408 U.S. 665 (1972) ...............................................................................10, 13

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.,*
861 F.3d 1081 (10th Cir. 2017) .................................................................... 24

*Brown v. City of Tulsa,*
124 F.4th 1251 (10th Cir. 2025) .....................................................................7

*Brown v. Palmer,*
915 F.2d 1435 (10th Cir. 1990) .................................................................... 25

*Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.,*
660 F. App'x 600 (10th Cir. 2016) ................................................................ 25

*CFTC v. Reed,*
481 F. Supp. 2d 1190 (D. Colo. 2007) .......................................................... 30

*CLS v. Martinez,*
561 U.S. 661 (2010) ...................................................................................... 18

*Clyma v. Sunoco, Inc.,*
594 F.3d 777 (10th Cir. 2010) ...................................................................... 13

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
473 U.S. 788 (1985) ........................................... 8-9, 15-16, 18-19, 23

*Courthouse News Serv. v. Smith*,
126 F.4th 899 (4th Cir. 2025)........................................................................9

*Danielson v. Huether*,
355 F. Supp. 3d 849 (D.S.D. 2018) ............................................................ 12

*Douglass v. Garden City Cmty. Coll.*,
543 F. Supp. 3d 1043 (D. Kan. 2021) ........................................................ 11

*Friends of Animals v. Bernhardt*,
15 F.4th 1254 (10th Cir. 2021) .................................................................. 11

*Golicov v. Lynch*,
837 F.3d 1065 (10th Cir. 2016)................................................................. 29

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001) .................................................................................... 25

*Hawkins v. City & Cnty. of Denver*,
170 F.3d 1281 (10th Cir. 1999) ................................................................. 20

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) ...................................................................................... 10

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) .................................................................................. 19

*Integrated Bus. Plan. Assocs. v. Operational Results, Inc.*,
2024 WL 2862420 (D. Utah June 6) .................................................... 29, 30

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*,
994 F.3d 602 (7th Cir. 2021) ............................. 8, 15-17, 19, 22, 25, 30

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023) .............................................................. 7, 21

*N.M. ex rel. Balderas v. Google, LLC*,
489 F. Supp. 3d 1254 (D.N.M. 2020) .................................................... 7, 11

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
565 F.3d 683 (10th Cir. 2009) .................................................................. 11

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .................................................................................. 26

*Okla. Hosp. Ass'n v. Okla. Pub. Co.*,
748 F.2d 1421 (10th Cir. 1984) ................................................................. 10

*Pahls v. Thomas*,
718 F.3d 1210 (10th Cir. 2013) ............................................................. 8, 20

*Pell v. Procunier,*
    417 U.S. 817 (1974) ................................................................................. 10

*Pen Am. Ctr., Inc. v. Trump,*
    448 F. Supp. 3d 309 (S.D.N.Y. 2020) .................................................. 14

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
    460 U.S. 37 (1983) ............................................... 17-18, 20-21, 23

*Potts v. Ctr. for Excellence in Higher Educ.,*
    908 F.3d 610 (10th Cir. 2018) .............................................................. 31

*Raycom Nat'l, Inc. v. Campbell,*
    361 F. Supp. 2d 679 (N.D. Ohio 2004).......................................... 10, 26

*Ridge at Red Hawk, L.L.C. v. Schneider,*
    493 F.3d 1174 (10th Cir. 2007).............................................................. 7

*Schaffer v. Salt Lake City Corp.,*
    814 F.3d 1151 (10th Cir. 2016) .............................................................. 8

*Shrum v. Cooke,*
    60 F.4th 1304 (10th Cir. 2023) .............................................................. 8

*Smith v. Plati,*
    258 F.3d 1167 (10th Cir. 2001) ........................................................... 10

*Snyder v. Ringgold,*
    133 F.3d 917, 1998 WL 13528 (4th Cir. 1998).............................. 13-14

*Taylor v. Roswell Indep. Sch. Dist.,*
    713 F.3d 25 (10th Cir. 2013) ............................................................... 27

*Trant v. Oklahoma,*
    754 F.3d 1158 (10th Cir. 2014)...................................................... 21, 26

*United States v. Kokinda,*
    497 U.S. 720 (1990) ............................................................................ 16

*Vidal v. Elster,*
    602 U.S. 286 (2024) ....................................................................... 19-20

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ............................................................................ 29

*Washington v. Martinez,*
    2020 WL 209863 (D. Colo. Jan. 14) .................................................. 26

*Wells v. City & Cnty. of Denver,*
    257 F.3d 1132 (10th Cir. 2001) ...................................................... 8, 25

*Wyo. Gun Owners v. Gray*,
  83 F.4th 1224 (10th Cir. 2023) ...................................................................29-30

*Zemel v. Rusk*,
  381 U.S. 1 (1965) .............................................................................................9

**Other Authorities**

@schotthappens, Instagram (Dec. 17, 2024),
  https://bit.ly/4gkJpkv ...................................................................... 32

@schotthappens, Instagram (Mar. 20, 2025),
  https://bit.ly/3XKptRM.................................................................... 11

@schotthappens, Instagram (Mar. 3, 2025),
  https://bit.ly/3FXUonO ................................................................... 13

@schotthappens.com, Bluesky (Dec. 16, 2024, at 6:40 PM),
  https://perma.cc/SV5K-XTWW ...................................................... 32

*Archive*, Utah Senate,
  https://bit.ly/4iW6n3R.................................................................... 12

*Blog*, Merriam-Webster,
  https://bit.ly/4hgheo5 ..................................................................... 31

Bryan Schott, *Political payback? Utah teachers' union locked out of
  discussions on bill to limit their power*, Utah Pol. Watch (Jan. 9, 2025),
  https://perma.cc/5ZNP-4D6E .......................................................... 13

Editorial Board, *Tribune editorial: Utah Legislature declares phony
  'emergency' in drive to rob the people of what little power they have*,
  Salt Lake Trib. (Aug. 25, 2024),
  https://perma.cc/6TC3-XX7B........................................................... 22

*Editorial policies and ethics*, Salt Lake Trib.,
  https://perma.cc/M8GN-VGDR....................................................... 32

Eli Stokols, *Trump briefing begins with pledge to boost outside media*,
  Politico (Jan. 28, 2025),
  https://bit.ly/4jG7S71 ...................................................................... 15

*Freelancer*, Merriam-Webster,
  https://bit.ly/40TW1KW.................................................................. 31

*Governor's Monthly News Conference*, PBS Utah,
  https://bit.ly/4aDOh3h..................................................................... 11

vi

*House - 2025 General Session - Day 1*, Utah State Legis.,
    https://bit.ly/3EsB9BK......................................................................... 12

*Independent media*, Oxford Reference,
    https://perma.cc/339E-6P8J .............................................................. 24

*Independent*, Oxford English Dictionary,
    https://perma.cc/PP46-779P ............................................................. 24

Mary Margaret Olohan, *White House Receives Over 7,400*
    *New Media Requests Within 24 Hours*, Daily Wire (Jan. 29, 2025),
    https://perma.cc/HL5A-FTT7 ........................................................... 15

*Recent Posts*, Utah House,
    https://bit.ly/4jDWlnZ ....................................................................... 12

*See Senate - 2025 General Session - Day 1*, Utah State Legis.,
    https://bit.ly/4aDcqqo ....................................................................... 12

Special Session with Bryan Schott, *Podcast: Week one comin'*
    *in hot!*, at 19:51-21:26, Utah Pol. Watch (Jan. 24, 2025),
    https://bit.ly/43GoZQr ...................................................................... 13

Utah House Reps, *Utah House Majority releases 2025 priorities*,
    YouTube (Jan. 30, 2025),
    https://bit.ly/3E8WNLB ................................................................... 11

Utah Senate, *Utah Senate Media Availability – Day 1 – 2025*
    *General Session*, Facebook (Jan. 21, 2025),
    https://bit.ly/4gmkE7w..................................................................... 12

## MOTION

Defendants move to dismiss Plaintiffs' amended complaint [Dkt.36] for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). The complaint alleges that Defendants violated the First and Fourteenth Amendments in denying Plaintiffs a 2025 media credential. But Plaintiffs fail to plausibly plead that Defendants' credentialing criteria (1) burden protected First Amendment activity, are unreasonable, or discriminate based on viewpoint; (2) were established in retaliation for Plaintiffs' speech; (3) operate as a prior restraint; or (4) use unduly vague terms. For these reasons, and as more fully discussed below, the Court should dismiss the amended complaint with prejudice.

## INTRODUCTION

The Court is familiar with the facts and legal issues here, having denied at a hearing Plaintiffs' motion for a TRO. In its oral ruling denying that motion, the Court rejected arguments that the Legislature's 2025 credentialing policy is unlawful and that Plaintiffs would suffer irreparable harm absent equitable relief. Tr.62:20-87:22 [Dkt.32]. The amended complaint fails to cure the deficiencies in Plaintiffs' claims that the Court identified. The Court should dismiss the amended complaint with prejudice.

1

# BACKGROUND

## A.    Access to the Legislature and the media credentialing policy

**1.** "The Utah Legislature is dedicated to maintaining a transparent government, and the Capitol is open to all." Ex.10.[1] "Committee meetings, legislative floor debates, agenda items and materials are readily accessible on the legislative website, and everyone is welcome to attend committee meetings and floor time." *Id.* "[N]othing prevents individuals from reporting on the proceedings of the Utah Legislature, regardless of whether they hold a media credential." *Id.*

Credentialed media, however, receive some benefits at the Capitol. They receive access to the Capitol press room, designated areas in the Senate and House chambers, a limited number of designated media workspaces in the Senate and House galleries, and a limited number of designated media parking spaces. Ex.8. They also may be permitted access to media availabilities and other press events with elected officials. *Id.*

**2.** The Legislature "adopted a written media credentialing policy in 2018." ¶26. The 2018 policy set forth "[d]efining characteristics" of eligible reporters: "represent institution[s] that hire and fire, can be held responsible for actions, sued for libel"; "have editors, to whom they are responsible," "aren't the final arbiter and executioners of their own stories," and "don't just represent their own stream of consciousness"; "adhere to a defined professional code of ethics"; and "represent institutions with a track

---

[1] Citations to ¶__ and Ex.__ refer to Plaintiffs' amended complaint [Dkt.36].

record," *i.e.*, "have been in the business for a period of time and have established they are not lobbyist organizations, political parties, or flash-in-the-pan charlatans with blog sites." Ex.1. Characteristics of ineligible reporters included "[b]log site owners" where "[t]he writing is essentially their own stream of consciousness, with little or no editorial oversight" and "[o]rganizations with no history or track record," "[l]ittle or no institutional framework," and "not bound by a journalistic code of ethics." *Id.* The 2018 policy recognized that "[t]hese characteristics will likely change as the characteristics of the media industry evolve." *Id.*

As anticipated, the Legislature made incremental changes over the years. The 2019 policy maintained the same criteria. Ex.2. The 2020 policy provided that an applicant must "[b]e a professional journalist" and "[r]epresent news organizations or publications that have a track record," among other things. Ex.3. The 2021 policy required that an applicant "[b]e a professional journalist" and "[r]epresent an established, reputable news organization or publication," among other things. Ex.4. The 2022, 2023, and 2024 policies maintained these requirements. *See* Exs.5-7.

As to bloggers and independent media, the 2019 policy added a note suggesting that "a blog site owner or organization not bound by a code of ethics" could receive a credential by agreeing to abide by one. Ex.2. The 2021 and 2022 policies provided: "Bloggers representing a legitimate independent news organization may become credentialed under some circumstances." Ex.4-5. The 2023 and 2024 policies narrowed

that availability: "Bloggers representing a legitimate independent news organization may become credentialed *under limited, rare circumstances*." Exs.5-6 (emphasis added).

**3.** In November 2024, the Legislature issued its 2025 credentialing policy. Like immediately preceding policies, the 2025 policy requires applicants to "[c]omplete the online <u>application</u>"; "[b]e a professional member of the media … who regularly covers the Legislature and Capitol in person and is part of an established reputable news organization or publication"; "provide an annual background check"; "[a]dhere to a professional code of ethics"; and "[c]omplete the yearly harassment prevention training." Ex.8. Directionally consistent with prior revisions, the 2025 policy revised the standard for bloggers: "Blogs, independent media or other freelance media do not qualify for a credential." *Id.*

### B. The denial of Schott's application for a 2025 media credential

**1.** Bryan Schott worked as a political correspondent at the *Salt Lake Tribune* from 2020 to 2024. ¶¶15-16. He left the *Tribune* and "founded Utah Political Watch in October 2024." ¶16. Schott is UPW's "owner," "publisher," "sole reporter," and "Editor-in-Chief." ¶¶4, 18. UPW "employs" as an editor Malissa Morrell, who "has played a prominent role in UPW's output since its launch." ¶18. Morrell has served as Schott's "copyeditor in an unofficial capacity … since at least 2015," assisting with "story selection, improving [Schott's] stories (grammar, clarity, brevity) and headline writing." ¶18. Schott did not disclose Morrell's role when he applied for a 2025 media credential. ¶19.

Schott alleges that his reporting in 2024 "drew the ire of legislative leaders," citing three incidents. ¶46. First, Schott wrote an article accusing House Speaker Mike Shultz of dodging questions at a press conference. ¶¶47-48. Schultz texted Schott in response, "accusing [him] of bias." ¶49. Second, in response to Schott insulting media staffers on X, Defendant Abby Osborn criticized Schott and defended the staffers. ¶50.[2] Third, in December 2024, Schott, now writing for UPW, reported that a complaint alleged Senate President Stuart Adams "violated campaign disclosure laws." ¶51. Adams publicly criticized Schott's reporting. ¶52. Defendant Aundrea Peterson also criticized Schott "[i]n an iMessage exchange" for his lack of ethical standards and disregard for accuracy. ¶53. Attempting to set the stage for this lawsuit, Schott wrote, "It certainly sounds like you're going to use your criticism of this story you don't like to deny me a press credential next week." Ex.9. Peterson assured Schott of Defendants' neutral application of its credentialing policy: "We will follow our policy when reviewing media credential applications." ¶55; *see* Ex.9.

**2.** On December 17, Schott applied for a press credential for the 2025 legislative session. ¶56. Defendant Alexa Musselman notified Schott by e-mail that his application had been denied because "media credentials are currently not issued to blogs, independent, or other freelance journalists." ¶60. On December 26, Defendants Osborne and

---

[2] Schott deleted the post and omitted it from the amended complaint. Defendants filed it at Dkt.28-7. *See* Tr.57:15-17 (characterizing Schott's post as "an unflattering and critical comment of staffers").

Mark Thomas denied Schott's appeal, explaining that Schott was not "a professional member of the media associated with an established, reputable news organization or publication" and that "[b]logs, independent media outlets or freelance media do not qualify for credentials." ¶¶61-62; *see* Ex.10.

### C. Procedural history

On January 22, 2025, one day after the legislative session began, Plaintiffs sued and moved for a TRO and preliminary injunction. ¶94; Dkts.1-3. After full briefing and a hearing, the Court orally denied the motion, holding Plaintiffs failed to show a likelihood of success on the merits of each claim asserted, Tr.73:11-85:7—each of which is reasserted in Plaintiffs' amended complaint.

Plaintiffs' amended complaint asserts four claims under 42 U.S.C. §1983 and the First and Fourteenth Amendments. First, Plaintiffs allege the credentialing policy and its application deprives them of their right to news gather, is unreasonable, and discriminates based on content and viewpoint (Counts I, II).[3] ¶¶103-33. Second, they allege Defendants denied Schott a press pass in retaliation for Schott's criticisms of the Legislature (Count III). ¶¶134-39. Third, they allege the credentialing policy operates as a prior restraint (Count IV). ¶¶140-44. Finally, they allege the policy is unconstitutionally vague (Count V). ¶¶145-55. Plaintiffs seek an injunction compelling "Defendants to

---

[3] Plaintiffs plead these claims separately, but they present the same issue—whether the credentialing policy is lawful under the standards applicable to the forum—and therefore are duplicative.

6

grant Schott press credentials for the 2025 legislative session," declaratory relief, and nominal damages. ¶¶A-C.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court "accept[s] the well-pleaded facts alleged as true," it "need not accept threadbare recitals of the elements of a cause of action that are supported by mere conclusory statements." *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023) (cleaned up). "A conclusory allegation is one in which an inference is asserted without 'stating underlying facts' or including 'any factual enhancement.'" *Id.* While consideration of a motion to dismiss is generally limited to the complaint, the Court may consider "documents attached to the complaint as exhibits" and "matters subject to judicial notice." *Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025). The Court may "take judicial notice of factual information found on the world wide web." *N.M. ex rel. Balderas v. Google, LLC*, 489 F. Supp. 3d 1254, 1257 (D.N.M. 2020).

To state a claim under §1983, Plaintiffs must plausibly allege a "(1) deprivation of a federally protected right by (2) an actor acting under color of state law." *Schaffer v.*

*Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016). The elements necessary to establish the deprivation of a federal right "will vary with the constitutional provision at issue." *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013). Failure to plead an element of a §1983 claim with the needed specificity warrants dismissal. *See Shrum v. Cooke*, 60 F.4th 1304, 1310-12 & n.3 (10th Cir. 2023).

## ARGUMENT

### I. Plaintiffs fail to plausibly plead a First Amendment violation under public forum doctrine (Counts I, II).

Plaintiffs' challenge to the denial of a media credential concerns alleged First Amendment activity "on government property," triggering a well-established "three-step analytical framework." *Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1144 (10th Cir. 2001); *see, e.g., John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 611-12 (7th Cir. 2021) (explaining forum doctrine "addresses who has the right of access to government property to engage in various expressive pursuits," including "gathering information for news dissemination"). First, Plaintiffs must show that their activities are protected by the First Amendment. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). Second, the court "must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* Third, the court "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.*

### A. Plaintiffs have not shown a protected First Amendment right of newsgathering or equal access.

Counts I and II fail at step one of the forum analysis because Plaintiffs do not allege an infringement of activity "protected by the First Amendment." *Id.* "It is helpful first to identify the nature of the right allegedly infringed" because "the asserted right is more narrowly defined" than Plaintiffs claim. *Courthouse News Serv. v. Smith*, 126 F.4th 899, 907 (4th Cir. 2025). Defendants do not dispute that Schott engages in protected First Amendment activity when he gathers news. But their denial of Schott's media credential does not limit any protected First Amendment activity because Schott maintains access to all government information available to the public even without a credential. He thus has not shown a burden on protected First Amendment activity.

**1.** Plaintiffs allege a sweeping "First Amendment right to gather news." ¶107. But as the Court held, Defendants do not "violate the First Amendment by establishing certain criteria to regulate the distribution of media credentials, because the plaintiffs do not have an unfettered constitutional right of access" and "legislative rules do not prohibit Schott from entering the legislature to … '[g]ather information he might find relevant to his opinion of the way the state is being run." Tr.76:9-18 (paraphrasing *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)).

The First Amendment does not bestow an "unrestrained right to gather information." *Zemel*, 381 U.S. at 17. Nor does it "guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*,

408 U.S. 665, 684 (1972). The Supreme Court has long rejected the notion that "the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally." *Pell v. Procunier*, 417 U.S. 817, 834 (1974). Thus, "there is no general First Amendment right of access to all sources of information within governmental control." *Smith v. Plati*, 258 F.3d 1167, 1178 (10th Cir. 2001). This limitation "applies equally to both public and press, for the press, generally speaking, do not have a special right of access to government information not available to the public." *Id.* (collecting cases). So "whatever the extent of protection warranted newsgathering, it is no greater than the right of the general public to obtain information." *Okla. Hosp. Ass'n v. Okla. Pub. Co.*, 748 F.2d 1421, 1425 (10th Cir. 1984).

Here, denying Schott a media credential has not deprived Plaintiffs of any publicly accessible government information. Plaintiffs' claims boil down to where and how—not whether—they access information. Plaintiffs complain about their inability "to view and report … *from the designated media areas* throughout the Capitol." ¶98 (emphasis added). But "the media have no special right of access … different from or greater than that accorded the public generally." *Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978) (plurality op.). And Plaintiffs here are "not being denied access to information available to the public generally." *Raycom Nat'l, Inc. v. Campbell*, 361 F. Supp. 2d 679, 684 (N.D. Ohio 2004). The complaint nowhere alleges that legislative floor debates and

committee meetings cannot be viewed in person or online by anyone, press credential or not. Nor could it. "Committee meetings, legislative floor debates, agenda items and materials are readily accessible on the legislative website, and everyone is welcome to attend committee meetings and floor time." Ex.10.

Plaintiffs claim their lack of a credential has hampered Schott's ability to gather news in several ways. But the complaint fails to plead how Schott lacks access to government information through alternative means.

*First*, Plaintiffs allege that Schott cannot attend legislative and gubernatorial press conferences "in person." ¶¶95-96. But the complaint does not allege that such press conferences are otherwise unavailable for Schott to view. Nor could it, as they are available online. *See, e.g.*, Utah House Reps, *Utah House Majority releases 2025 priorities*, YouTube (Jan. 30, 2025), https://bit.ly/3E8WNLB; *Governor's Monthly News Conference*, PBS Utah, https://bit.ly/4aDOh3h.[4] In fact, Schott reported on Governor Cox's latest "semiregular televised press conference"—with video footage. @schotthappens, Instagram (Mar. 20, 2025), https://bit.ly/3XKptRM.

*Second*, Plaintiffs allege Schott could not "cover the opening addresses by the Senate President and Speaker of the House." ¶97. But the complaint does not explain

---

[4] The Court may take "judicial notice of the existence and online availability" of the Internet materials cited herein, the sole purpose for which Defendants cite them. *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 719 n.48 (10th Cir. 2009) ("press release"); *see Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1263 & n.5 (10th Cir. 2021) ("online newspaper articles and social media posts"); *Douglass v. Garden City Cmty. Coll.*, 543 F. Supp. 3d 1043, 1054 (D. Kan. 2021) ("public meeting[] videos"); *Balderas*, 489 F. Supp. 3d at 1257 ("information found on a party's website").

why Schott could not have viewed these addresses in person from the chamber gallery—where designated media workspaces are located. ¶39. Nor does the complaint say why Schott could not have viewed these addresses live online. *See Senate - 2025 General Session - Day 1*, Utah State Legis., https://bit.ly/4aDcqqo; *House - 2025 General Session - Day 1*, Utah State Legis., https://bit.ly/3EsB9BK.

*Third*, Plaintiffs claim Schott has "missed multiple legislative press releases." ¶95. While the complaint alleges Schott is not on the "press release list," it does not allege that the releases are not otherwise accessible. ¶45. Nor could it, as they are publicly available online. *Archive*, Utah Senate, https://bit.ly/4iW6n3R; *Recent Posts*, Utah House, https://bit.ly/4jDWlnZ; *see Danielson v. Huether*, 355 F. Supp. 3d 849, 868 (D.S.D. 2018) (rejecting First Amendment claim to "receive notifications of press releases … normally sent to the media" where plaintiff could "learn of [them] from other sources").

*Fourth*, Plaintiffs claim "Schott is being denied entry" to "House or Senate rules committee meetings." ¶97. But such meetings are "open to all." Ex.10.

*Fifth*, Plaintiffs claim Schott cannot attend "media availabilities with the Speaker of the House in his office." ¶97. But the complaint nowhere alleges that media availabilities are not accessible online. Nor could it. *See e.g.*, Utah Senate, *Utah Senate Media Availability – Day 1 – 2025 General Session*, Facebook (Jan. 21, 2025), https://bit.ly/4gmkE7w.

*Sixth*, Plaintiffs allege that Schott cannot "speak to legislators and their staff" or "ask questions" at gubernatorial press conferences. ¶¶96, 99. But the complaint does not allege that Schott cannot do so in public spaces or through private channels, as he has done. *E.g.*, ¶¶53, 59 (Schott texting Musselman and Peterson). And Schott has published several articles with statements of legislators that he obtained through direct communications. *E.g.*, Bryan Schott, *Political payback? Utah teachers' union locked out of discussions on bill to limit their power*, Utah Pol. Watch (Jan. 9, 2025), https://perma.cc/5ZNP-4D6E.

*Seventh*, Plaintiffs allege Schott is in a less advantageous "position to obtain videos, photographs, and audio recordings." ¶¶97-98. But the complaint nowhere alleges that Schott cannot obtain such materials. And Schott has reported on legislative actions with such materials. *See* @schotthappens, Instagram (Mar. 3, 2025), https://bit.ly/3FXUonO; Special Session with Bryan Schott, *Podcast: Week one comin' in hot!*, at 19:51-21:26, Utah Pol. Watch (Jan. 24, 2025), https://bit.ly/43GoZQr.

**2.** Plaintiffs also assert a First Amendment right of equal access as a member of the press. ¶¶109-10. But Plaintiffs' asserted "right of 'equal access' … cannot be limited to members of the media without conferring a privileged First Amendment status on the press, and the Supreme Court has affirmed that the press does not enjoy special First Amendment rights that exceed those of ordinary citizens." *Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528, at *4 (4th Cir. 1998) (citing *Branzburg*, 408 U.S. at 684-85); *see Clyma v. Sunoco, Inc.*, 594 F.3d 777, 780 (10th Cir. 2010) ("the media does not have a

13

special right of access to information unavailable to the public"). Plaintiffs' "asserted right would require that, in each and every circumstance where the government made news available, it would have to give access to that information to *everyone* on equal terms." *Snyder*, 1998 WL 13528, at *4. If that were so, the Legislature could not continue to hold in-office briefings with the Senate President and House Speaker or other private media events. Courts have rightly rejected such a "broad rule" as "untenable." *Id.*

Plaintiffs' theory also "flies in the face of so much well settled practice." *Id.* "Public officials routinely select among reporters when … providing access to nonpublic information." *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 417 (4th Cir. 2006). Plaintiffs' view of unbridled "equal access" would categorically "preclude the White House's practice of allowing only certain reporters to attend White House press conferences, even though space constraints make it impractical to open up the conference to all media organizations." *Snyder*, 1998 WL 13528, at *4; *see Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 328 (S.D.N.Y. 2020) (noting president's "significant discretion over White House press credentials and reporters' access to the White House"). Accepting Plaintiffs' theory "would 'plant the seed of a constitutional case' in 'virtually every' interchange between public official and press." *Balt. Sun*, 437 F.3d at 418.

Recent events at the White House confirm that Plaintiffs' "equal access" theory is unworkable. The president's press secretary announced that the administration would extend access beyond "legacy media" to "less traditional outlets and even independent

14

bloggers." Eli Stokols, *Trump briefing begins with pledge to boost outside media*, Politico (Jan. 28, 2025), https://bit.ly/4jG7S71. Within 24 hours, the White House received over 7,400 requests for access to the briefing room. Mary Margaret Olohan, *White House Receives Over 7,400 New Media Requests Within 24 Hours*, Daily Wire (Jan. 29, 2025), https://perma.cc/HL5A-FTT7. Surely the First Amendment does not mandate conferring credentials on all 7,400 applicants. As the Seventh Circuit held in rejecting this same "equal access" theory, government officials need not "grant every media outlet access to every press conference." *Evers*, 994 F.3d at 614. The court emphasized the "chaos that might ensue if every gubernatorial press event had to be open to any 'qualified' journalist." *Id.* This Court should reject Plaintiffs' theory and the "havoc" that would ensue. *Id.* at 612.

***

Because Plaintiffs have failed to plead a constitutionally cognizable restriction on their ability to gather news, their First Amendment claims fail at step one of the forum analysis.

### B.   The credentialing policy satisfies the requisite standard.

Even if Plaintiffs' well-pleaded factual allegations establish that the denial of a credential limits protected First Amendment activity, the Legislature's "justifications" for denying Schott a credential and his "exclusion from the relevant forum satisfy the requisite standard." *Cornelius*, 473 U.S. at 797. The restricted areas to which Plaintiffs

seek access are either a "nonpublic forum" or a "limited public forum." Tr.77:9-23; ¶109; *see Evers*, 994 F.3d at 610 (classifying governor's "limited-access press conference" as nonpublic forum); *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 80 (D.D.C. 2023) (classifying White House press area as "nonpublic or limited public" forum). Either way, the standard is the same. *See United States v. Kokinda*, 497 U.S. 720, 730 (1990). Government control over access "can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. Here, the credentialing policy is reasonable and viewpoint neutral.

### 1. The credentialing policy is reasonable considering the forum's purpose.

"The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Id.* at 808. Reasonableness "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Id.* at 809.

This Court already held that the Legislature's credentialing policy is reasonable considering the forum's purpose. Tr.78:15-19. Based on the credentialing criteria, the policy is designed to give professional journalists and media representatives from reputable organizations access to cover the Legislature and other significant events at the Capitol. The requirements that an applicant be a "professional member of the media" and "[a]dhere to a professional code of ethics" aim to support informed reporting while

maintaining the integrity of the Capitol. Ex.8. For similar aims, the policy requires applicants to be "part of an established reputable news organization or publication" and excludes "[b]logs, independent media or other freelance media." *Id.* Denying credentials to bloggers and other independent media reasonably ensures professional journalists and established media maintain sufficient access.

*Evers* is similar. The credentialing policy there required an applicant to be "a bona fide correspondent of repute in their profession" and "employed by or affiliated with an organization whose principal business is news dissemination." 994 F.3d at 606. The policy further required news organizations to have "published news continuously for at least 18 months" and have "a periodical publication component or an established television or radio presence." *Id.* The Seventh Circuit held these were "reasonably related to the viewpoint-neutral goal of increasing the journalistic impact of the Governor's messages by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to craft newsworthy stories." *Id.* at 610; *see Ateba*, 706 F. Supp. 3d at 84 (agreeing). So too here.

The reasonableness of the credentialing policy "is also supported by the substantial alternative channels that remain open" for news gathering. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 53 (1983). When considering forum "access barriers," the Supreme Court has "counted it significant that other available avenues for the [plaintiff] to exercise its First Amendment rights lessen the burden created by those

17

barriers." *CLS v. Martinez*, 561 U.S. 661, 690 (2010). Shown above, the complaint does not allege facts establishing that Schott is without other available avenues to obtain the information on which he seeks to report. *Supra* pp.11-13. In other words, Plaintiffs are "assured of equal access to all modes of communication." *Perry*, 460 U.S. at 53. Their "ability" to news gather is not "seriously impinged by the restricted access," *id.*, as this Court recognized, *see* Tr.86:18-87:3. Even if those other channels are not Plaintiffs' preferred means to gather news, "[t]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means" to engage in First Amendment activity. *Cornelius*, 473 U.S. at 809.

The "surrounding circumstances" confirm the reasonableness of the latest policy revision. *Id.* That revision eliminated any discretion in credentialing decisions and thus serves to improve consistency and predictability. So "[i]nstead of employing discretion in determining which journalists are eligible to hold a [press] pass," the Legislature now employs "clear and definite standards that are not amenable to discretionary judgments." *Ateba*, 706 F. Supp. 3d at 84 (holding White House credentialing policy was "facially reasonable"). Confirming the point, the Legislature has seen an increase in "nontraditional, independent media" inquiring about credentials. ¶36 (citing Peterson-Decl. ¶32 [Dkt.26]). The Legislature's limiting press credentials to established news organizations reasonably helps the press corps maintain its legitimacy amid the rise in

18

nontraditional media. *Cf. Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 685 (1992) (finding concerns over "incremental effects" reasonable).

Plaintiffs' allegations challenging the policy's reasonableness are unpersuasive. Plaintiffs' allegation that "Defendants do not have space or security concerns" is conclusory and unsupported by factual allegations. ¶113. It is also implausible, since the designated spaces for credentialed media are indoors and limited in number. *Id.* Nor is the policy "full of discretionary decisions," *contra id.*, because the terms "blog," "independent," "reputable," and "established" have clear meanings, *infra* pp.30-31. Finally, Plaintiffs argue that bloggers' ineligibility for credentials based on the lack of an editor or use of "'stream of consciousness' reporting" is unreasonable because "style and editing choices … do not affect security or space within the forum." ¶114. But this requirement serves the goals of journalistic quality and integrity in reporting. *See Ever*s, 994 F.3d at 606-07, 610-11 (holding that "bona fide correspondent of repute in their profession" was a reasonable criterion). The credentialing policy is reasonable.

### 2.    The credentialing policy is viewpoint neutral.

Viewpoint discrimination occurs when the government targets "particular views taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024). Government discriminates based on viewpoint "when it denies access to a speaker solely to suppress the point of view he espouses." *Cornelius*, 473 U.S. at 806. Here, the credentialing policy is viewpoint neutral, both on its face and as applied.

As this Court held, the "2025 credentialing policy draws no distinctions based upon the viewpoint of the speaker, and there is no reason to think that in application it would tend to favor some viewpoints or ideas at the expense of others." Tr.78:20-25 (paraphrasing *Pahls*, 718 F.3d at 1234). None of the credentialing criteria is "based on the specific motivating ideology or the opinion or perspective of the speaker." *Vidal*, 602 U.S. at 294. As the Court recognized, "[t]he term 'reputable organizations' does not itself assume or prescribe any particular viewpoint." Tr.79:6-7. And in assessing applications, Defendants consider whether the organization has a "track record" and whether the reporter is responsible to an editor. ¶¶74-75. These criteria are "based on the *status* of the respective" organization or journalist "rather than their views." *Perry*, 460 U.S. at 49. The policy excludes these reporters "[n]o matter the message [they] want[] to convey." *Vidal*, 602 U.S. at 293-94.

Beyond that, the Legislature "did not apply the policy in this case to the plaintiffs on the basis of their viewpoint." *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1288 (10th Cir. 1999). The Legislature denied Schott's application because Schott and UPW, as a blog or independent journalist, did not meet the requisite criteria under the 2025 credentialing policy. ¶¶60, 62. Application of those objective criteria did not turn on Plaintiffs' viewpoint.

Plaintiffs' contrary assertions are based only on the fact that Schott's reporting allegedly angered Defendants. But, as further discussed regarding Plaintiffs' retaliation

20

claim, *infra* pp.26-27, "temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive." *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014). No allegations in the complaint (other than temporal proximity) provide any "indication" that Defendants "intended to discourage one viewpoint and advance another." *Perry*, 460 U.S. at 49.

Plaintiffs suggest the Legislature altered its policy to exclude Schott given his unfavorable reporting on the Legislature. ¶126. But the complaint pleads no facts permitting an inference that Defendants revised the policy with Plaintiffs in mind, rendering that allegation a "threadbare recital[] … supported by mere conclusory statements," which this Court "need not accept." *Matney*, 80 F.4th at 1144 (cleaned up). The latest revision to exclude blogs and independent media was "a continuation of prior limitations," Tr.84:8-11, narrowing the policy from "under some circumstances" in 2021 and 2022 to "under limited, rare circumstances" in 2023 and 2024, Exs.4-7; ¶¶30-31.

Plaintiffs' allegations of viewpoint discrimination do not suggest otherwise. Plaintiffs first cite Osborne's X post from January 2024—nearly a year before the policy revision and denial of Schott's application. ¶50. But Osborne's post related to Schott's insulting "media staffers who had difficulty setting up a backdrop," not any viewpoints expressed in his reporting. *Id.*

Plaintiffs next cite the spat with Adams and Peterson. ¶¶51-55. But as the Court recognized, "the credentialing policy was modified *before* that incident occurred,"

Tr.79:13-16 (emphasis added), so that incident could not have motivated the policy revision. And Defendants denied Schott's application because he did not meet the policy's objective criteria. ¶¶60, 62. Plaintiffs thus cannot use this incident to establish that Schott's viewpoints played any role in revising the policy or denying his application.

The Legislature's credentialing history and the current list of credentialed journalists confirms the absence of viewpoint discrimination. The Legislature has repeatedly credentialed journalists notwithstanding their personal (or their organizations') past coverage critical of the Legislature—including Schott when he wrote for the *Tribune. See* ¶65 & Ex.13 (listing publications with credentialed journalists); Editorial Board, *Tribune editorial: Utah Legislature declares phony 'emergency' in drive to rob the people of what little power they have*, Salt Lake Trib. (Aug. 25, 2024), https://perma.cc/6TC3-XX7B. Plaintiffs do not plead that these numerous organizations all have viewpoints Defendants approve of or have not criticized the Legislature, and any such allegations would be implausible. "[T]he inclusion of a broad range of media outlets on both sides of the political spectrum certainly diminishes any claim that the list is based on political ideology." *Evers*, 994 F.3d at 611.

Plaintiffs allege that credentialing decisions under the policy are "full of discretionary decisions." ¶113. But the revision to the policy to exclude blogs and independent media *eliminated discretion*. Prior versions of the policy could result in some nontraditional media receiving credentials and others not, depending on the "circumstances."

*See* ¶31. Now, rather than "employing discretion in determining which journalists are eligible [for credentials]," the Legislature employs "clear and definite standards that are not amenable to discretionary judgments." *Ateba*, 706 F. Supp. 3d at 84. This revision "reduces the risk" that officials "might allocate" credentials "based on the views of certain … reporters." *Id.*

Plaintiffs also claim the Legislature's focus on the nature of the publication, including "'stream-of-consciousness' reporting" and whether work is edited, indicates viewpoint discrimination. ¶125. It does not. Such considerations concern merely "how information is disseminated," "not … what can be published." Tr.79:6-9. As this Court explained, "It is a process of review as an indicia of the reliability of the news organization. Whether that is in favor of school vouchers or against school vouchers, the same editorial review would take place in that instance." Tr.48:15:24. Furthermore, governments may limit access to nonpublic forums "based on … speaker identity." *Cornelius*, 473 U.S. at 806. Indeed, such "distinctions … are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." *Perry*, 460 U.S. at 49.

Plaintiffs do not advance their claim by alleging that "credentials have been issued to reporters from multiple organizations that call themselves independent." ¶71. Plaintiffs misunderstand the term "independent" in the 2025 policy. It is used in the series "[b]logs, independent media or other freelance media." Ex.1. In context, it refers

23

to media that is not dependent on or connected to the existence or authority of a larger power structure or organization. *E.g.*, *Independent*, Oxford English Dictionary, https://perma.cc/PP46-779P; *see Independent media*, Oxford Reference, https://perma.cc/339E-6P8J ("1. [s]mall media production, marketing, or distribution companies not affiliated with a 'major' commercial company"). Utah News Dispatch, for example, necessarily uses the term differently since it is "an affiliate of States Newsroom." ¶92. The fact that credentialed publications consider themselves "independent" in some other sense does not mean they have not satisfied the policy's credentialing criteria by having editorial oversight and by being an established reputable news organization, among other things. UPW, conversely, is a self-run blog or independent media without those characteristics.

Finally, Plaintiffs' allegation that "journalists with a similar editorial structure to UPW" have received credentials, *e.g.*, ¶¶93, 123-24, is not supported by well-pleaded facts and therefore does not establish viewpoint discrimination. The complaint speculates that credential holders from Davis Journal and Utah Policy are "self-edited" but provides no supporting factual allegations concerning those entities' editorial structure, oversight, or practices. ¶¶88-90. Plaintiffs' allegations are also squarely contradicted by the list of 2025 applications, which shows every other official application denial concerned an applicant who is self-supervised like Schott. Ex.12 at 11; *see Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017) (explaining exhibit

to complaint controls over conflicting allegation). Plaintiffs have not plausibly alleged viewpoint discrimination.

***

Plaintiffs' alternate attempt to challenge the credentialing policy in Count II as discriminating based on content and subject to strict scrutiny fails because it employs the wrong legal standard. Plaintiffs concede that the policy regulates access to a limited public forum. ¶109; *see also* Tr.77:9-14. Standards of content discrimination and strict scrutiny only apply to "traditional public fora" and "designated public fora." *Wells*, 257 F.3d at 1144-45. In limited or nonpublic fora, "the government may regulate on the basis of the content of speech, as long as its regulations are reasonable and viewpoint neutral." *Brown v. Palmer*, 915 F.2d 1435, 1440 (10th Cir. 1990); *accord Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001). Strict scrutiny simply does not apply here. *See Evers*, 994 F.3d at 612-13; *Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*, 660 F. App'x 600, 606 (10th Cir. 2016).

## II.    Plaintiffs fail to plausibly plead retaliation (Count III).

Plaintiffs contend that Defendants revised the credentialing policy and denied Schott's application "in retaliation for his prior reporting." ¶¶136-39. To state a retaliation claim, Plaintiffs "must satisfy three elements: '(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to

25

engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'" *Trant*, 754 F.3d at 1169-70. Plaintiffs' claim fails on the second and third elements.

On the second element, the complaint's allegations do not establish that the denial of Schott's application or the latest policy revisions would chill a person of ordinary firmness from engaging in constitutionally protected activity. In fact, it has not chilled Schott from continuing to report critically of the Legislature, as is his right. *See Balt. Sun*, 437 F.3d at 419 (continued reporting disproved chilling element); *Raycom*, 361 F. Supp. 2d at 686 (same); *see also, e.g.*, *Washington v. Martinez*, 2020 WL 209863, at *6 (D. Colo. Jan. 14) ("persistence in speech is some evidence that the defendant's actions would not prevent such speech"). And the consequences of being denied a press pass—*e.g.*, lack of access to designated media workspaces or parking—are insufficiently consequential to cause a person of ordinary firmness not to criticize the Legislature.

On the third element, Plaintiffs must allege facts establishing "but-for" causation. *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). They do not. It is well-established that "temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive." *Trant*, 754 F.3d at 1170. But that is the entire basis of Plaintiffs' claim: Schott's reporting in 2024 "drew the ire" of Defendants. ¶¶46-55. Plaintiffs' own allegations demonstrate the implausibility of that narrative and undermine any suggested causal link. Schott's departure from

26

the *Salt Lake Tribune* most affected his eligibility for a press pass. *See* ¶¶15-16; Tr.84:15-19. The complaint nowhere alleges that Schott did not report critically of the Legislature or draw the ire of legislators or staff when he worked at the *Tribune*. The recent evolution of the credentialing policy—narrowing the eligibility of bloggers and independent media from "some circumstances" in 2021 and 2022 to "limited, rare circumstances" in 2023 and 2024 to ineligible in 2025, *supra* pp.3-4—undermines Schott's conclusory claim that his reporting prompted the latest revision. Tr.84:8-11 (observing 2025 revision "appears to be a continuation of prior limitations"). And upon leaving the *Tribune*, Schott would not have been eligible for a press pass even under the *former* policy. *See* Tr.84:15-19. Plaintiffs have not plausibly pleaded a retaliation claim.

## III.    Plaintiffs' prior-restraint claim fails (Count IV).

Plaintiffs claim the credentialing policy is an unlawful prior restraint. ¶¶141-44. It is not, as this Court held. *See* Tr.85:3-5 ("[T]he credentialing policy … does not constitute a prior restraint."). "[A] 'prior restraint' restricts speech in advance on the basis of content … ." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013). "[P]ress gallery regulations" do not impose "a prior restraint on the publication of news articles." *Ateba*, 706 F. Supp. 3d at 85; *see Bralley v. Albuquerque Pub. Sch. Bd. of Educ.*, 2015 WL 13666482, at *4 (D.N.M. Feb. 25) (rejecting claim that "denial of [plaintiff's] press pass constituted a prior restraint … as a member of the press" as supported by "no authority").

Here, Plaintiffs have not been "prohibited from speaking or publishing about" the Legislature. *Bralley*, 2015 WL 13666482, at *4. As Defendants explained to Schott, "nothing prevents individuals from reporting on the proceedings of the Utah Legislature, regardless of whether they hold a media credential." Ex.10. And as this Court recognized, "the plaintiffs have not been restricted from speaking or publishing any commentary on the 2025 legislative session." Tr.84:20-22. The 2025 credentialing policy "does not have th[e] effect" of "prevent[ing] the plaintiffs from reporting or publishing." Tr.83:12-16. And this is not the rare case where "*news gathering* (as opposed to speech)" has been "unreasonably restricted in advance," because Plaintiffs maintain access to all the information they seek. *See Bralley*, 2015 WL 13666482, at *3-4 (finding no prior restraint from denial of press pass where government did not "thwart[] any other attempt to attend the debate"). "[P]laintiffs are able to attend and view the legislators' actions, and the defendants have not instituted any policy prohibiting or attempting to regulate the plaintiffs' speech in any way." Tr.84:22-25. Plaintiffs' prior-restraint claim fails.

## IV.    Plaintiffs' void-for-vagueness claim fails (Count V).

Plaintiffs claim the credentialing policy is unconstitutionally vague. ¶¶146-55. This claim fails because void-for-vagueness doctrine does not apply to the credentialing policy and, in any event, the policy is not unduly vague.

Void-for-vagueness doctrine is grounded in the Due Process Clause. *Beckles v. United States*, 580 U.S. 256, 262 (2017). "[T]he Government violates [due process] by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Golicov v. Lynch*, 837 F.3d 1065, 1068 (10th Cir. 2016). The credentialing policy, however, is not a law and does not take away Plaintiffs' life, liberty, or property. "[P]laintiffs have not provided any authority establishing that [vagueness] doctrine necessarily applies to credentialing policies like those at issue here," Tr.80:17-22—not in their complaint or their motion for preliminary injunction. Void-for-vagueness doctrine does not apply here.

Even if void-for-vagueness doctrine applies, Plaintiffs' claim still fails. "The void-for-vagueness doctrine requires that statutory commands provide fair notice to the public." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023). Yet "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). To void a civil statute on vagueness grounds, it must be "so vague and indefinite as really to be no rule or standard at all." *Boutilier v. INS*, 387 U.S. 118, 123 (1967). "If persons of reasonable intelligence can derive a core meaning from a civil statute, it is not unconstitutionally void for vagueness." *Integrated Bus. Plan. Assocs. v. Operational Results, Inc.*, 2024 WL 2862420, at *9 (D. Utah June 6).

29

Plaintiffs challenge certain terms in the policy as "unduly vague." ¶147. But such terms are "commonly understood in the English language." *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1199 (D. Colo. 2007). And when considered in context, the terms have clear meanings. They are not unconstitutionally vague, as this Court held. *See* Tr.79:22-24 ("[T]he plaintiffs assert that the media credentialing policy is unconstitutionally vague, and I disagree."); Tr.81:17-21 ("The 2025 credentialing policy does not include terms not commonly understood in the English language … .").

Plaintiffs target the terms "established," "reputable," "blog," "independent," and "freelance" in the abstract. Plaintiffs' "narrow focus" on these terms "removes the important context of the credentialing rules." *Ateba*, 706 F. Supp. 3d at 83; *see Gray*, 83 F.4th at 1234 (considering terms in "context" amid "the surrounding words and phrases"). Viewed in context, the terms have "a core meaning." *Operational Results*, 2024 WL 2862420, at *9. Thus, courts have upheld similar credentialing policies that require a journalist to be "reputable" or "of repute." *See Ateba*, 706 F. Supp. 3d at 83 (rejecting argument that White House "requirement that journalists be 'bona fide … reporters of reputable standing'" was "standardless and susceptible to abuse"); *Ever*s, 994 F.3d at 606-07, 610-11 (holding "bona fide correspondent of repute in their profession" was a reasonable criterion).

Plaintiffs claim "blog" is vague because "it is unclear what qualifies as a 'blog' and whether it is only journalists who report exclusively on a 'blog,' as opposed to in

conjunction with other media formats, [who] cannot have credentials." ¶150. But "blog" has a well-known, ordinary meaning. *See Blog*, Merriam-Webster, https://bit.ly/4hgheo5 ("a regular feature appearing as part of an online publication that typically relates to a particular topic and consists of articles and personal commentary by one or more authors"). Read in context, a reasonable person can easily distinguish a blogger from a "professional member of the media" who "is part of an established reputable news organization or publication." Ex.8. And no reasonable person would think a "professional member of the media" becomes ineligible because he also operates a blog. *Contra* ¶150. The same is true for freelancers—a journalist who is "regularly employed" by a publication is plainly eligible for a credential *on behalf of that publication* even if he separately does freelance work for "another publication." *Contra* ¶149.

Plaintiffs also challenge the terms "independent media or other freelance media." ¶147. These terms "are associated in a context suggesting that the words have something in common" and so "they should be assigned a permissible meaning that makes them similar." *Potts v. Ctr. for Excellence in Higher Educ.*, 908 F.3d 610, 614 (10th Cir. 2018). The term "freelancer" already bears a meaning similar to "independent." *See Freelancer*, Merriam-Webster, https://bit.ly/40TW1KW ("a person who acts independently without being affiliated with or authorized by an organization"). And the policy's use of "other" before "freelance" confirms they should be read similarly. *See Potts*, 908 F.3d at 615.

Plaintiffs also misunderstand the criterion that applicants "[a]dhere to a professional code of ethics." ¶147. The policy does not require adherence to any specific code. Schott must know what it means for a journalist to "[a]dhere to a professional code of ethics," having previously worked at an outlet that professes to do so. *See Editorial policies and ethics*, Salt Lake Trib., https://perma.cc/M8GN-VGDR.

Finally, Plaintiffs cannot seriously claim vagueness when Schott knew all along he did not meet the policy's credentialing criteria. The day before he applied, Schott posted on social media expressing concerns that he would not qualify, trying to plant the seeds for his (false) narrative that the policy has been "weaponized against" him to "shut [him] out." *See* @schotthappens.com, Bluesky (Dec. 16, 2024, at 6:40 PM), https://perma.cc/SV5K-XTWW. He then posted a video documenting his application experience, which begins, "Come with me while I get denied a press credential for the first time ever." @schotthappens, Instagram (Dec. 17, 2024), https://bit.ly/4gkJpkv. These actions "demonstrate[] that Schott likely understood the criteria." Tr.81:24-82:3.

## CONCLUSION

The Court should dismiss Plaintiffs' amended complaint with prejudice.

32

Dated: April 8, 2025

Respectfully submitted,

/s/ Tyler R. Green

Victoria Ashby
Christine R. Gilbert
Alan R. Houston
 Office of Legislative Research
    & General Counsel
W210 State Capitol Complex
Salt Lake City, UT 84114
(801) 538-1032
vashby@le.utah.gov
cgilbert@le.utah.gov
ahouston@le.utah.gov

Tyler R. Green (Utah Bar No. 10660)
 Consovoy McCarthy PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Daniel M. Vitagliano (pro hac vice)
Julius Kairey (pro hac vice)
 Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
dvitagliano@consovoymccarthy.com
julius@consovoymccarthy.com

*Counsel for Defendants*

## WORD COUNT CERTIFICATION

I certify that this Motion to Dismiss Plaintiffs' First Amended Complaint contains 7,731 words and thus complies with DUCivR 7-1(a)(4).

/s/ Tyler R. Green

33