UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTAH POLITICAL WATCH, INC., and BRYAN SCHOTT, <br><br>    Plaintiffs, <br><br> v. <br><br> ALEXA MUSSELMAN, Utah House of Representatives Communications Director and Media Liaison Designee; ANDREA PETERSON, Utah Senate Deputy Chief of Staff and Media Liaison Designee; ABBY OSBORNE, Utah House of Representatives Chief of Staff; and MARK THOMAS, Utah Senate Chief of Staff, in their official and individual capacities, <br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:25-cv-00050-RJS <br><br> Chief District Judge Robert J. Shelby |

Now before the court are Plaintiffs Utah Political Watch, Inc. and Bryan Schott's Amended Motion for Preliminary Injunction,[1] and Defendants Alexa Musselman, Andrea Peterson, Abby Osborne, and Mark Thomas' Motion to Dismiss.[2]  For the reasons stated below, the court GRANTS Defendants' Motion to Dismiss and DENIES as moot the Preliminary Injunction Motion.

---

[1] Dkt. 37, *Amended Motion for Preliminary Injunction* (*Preliminary Injunction Motion*).

[2] Dkt. 53, *Motion to Dismiss Plaintiffs' First Amended Complaint* (*Motion*).

## FACTUAL BACKGROUND[3]

### A. Brian Schott and Utah Political Watch

Plaintiff Bryan Schott is a journalist who has been involved in media reporting in different capacities since 1993.[4]  After working for various radio stations for fifteen years, Schott joined an independent news organization, UtahPolicy.com, as a reporter and editor until 2020.[5]  Schott also hosted a political podcast and operated several websites covering Utah and Idaho politics from 2014 to 2020.[6]  In 2020, the Salt Lake Tribune (Tribune), a Utah daily newspaper, hired Schott as a political correspondent.[7]  In this capacity, Schott covered local news related to Utah politics and the Utah legislature.[8]  On September 9, 2024, a Tribune employee emailed the Utah legislature media designees stating, "Journalists share what media organization they are working for when applying for the credentials, and . . . and the news outlet is printed on the pass. I am unsure how this impacts his press pass, but I wanted you both to be aware that [Schott] no longer represents the Tribune."[9]  Schott subsequently founded Utah Political Watch, Inc. (UPW) in October 2024.[10]

---

[3] The following facts are set forth as alleged in the Amended Complaint and the parties' briefing, including the attached exhibits, with any factual disputes resolved in Plaintiffs' favor.  *See Bell Helicopter Textrox, Inc. v. Heliqwest Int'l, Ltd.*, 385 F.3d 1291, 1295 (10th Cir. 2004) ("When the evidence presented on a motion to dismiss consists of affidavits and other written materials the . . . district court must resolve all factual disputes in favor of the plaintiff.") (citation omitted); *Grynberg v. Ivanhoe Energy, Inc.*, 490 F. App'x 86, 90 (10th Cir. 2012) ("We accept as true any allegations in the complaint not contradicted by the defendant's affidavits, and resolve any factual disputes in the plaintiff's favor.").

[4] Dkt. 36, *Amended Complaint* ¶ 9.

[5] *Id.* ¶ 12.

[6] *Id.* ¶ 14.

[7] *Id.* ¶ 15.

[8] *Id*.

[9] Dkt. 55-15, *Email from Jeff Parrott, Salt Lake Tribune, to Aundrea Peterson and Alexa Musselman* (Sep. 9, 2024, 08:00 MST) (*Tribune Email*); Dkt. 36-10, *Amended Complaint Exhibit 10, December 2024 Letter to Bryan Schott* (*December Letter*), at 1.  Neither the email nor the parties' briefing provides any explanation for why Schott no longer worked for the Tribune.

[10] *Amended Complaint* ¶ 16.

UPW is a website that provides a free daily newsletter on Utah politics and additional content with a paid subscription.[11]  Schott is UPW's sole reporter, and UPW employs an editor to review Schott's work.[12]  Schott and UPW also produce a podcast where Schott discusses Utah politics, including the Utah legislative sessions.[13]  In addition to UPW's newsletter and podcast, Schott also posts videos about Utah politics on TikTok.[14]

### B.  Utah Legislature Media Coverage

The Utah legislature is open to the public.[15]  Any person may observe the legislative action from the chamber galleries where the media workspaces are located.[16]  Additionally, all official legislative action is livestreamed and archived on the legislature's website, including, but not limited to, committee and sub-committee meetings, debates, and votes.[17]  Similarly, members of the public may also speak with legislators and their staff in public spaces or through other private channels.[18]

Although the legislative session is open to the public, legislative staff formalized in 2018 a media credentialing policy establishing criteria for journalists to obtain additional privileges.[19] Media credential benefits included designated parking, access to workspace in the house and

---

[11] *Id.*

[12] *Id.* ¶ 18.  UPW's editor is Malissa Morrell.  *Id.*

[13] *Id.* ¶ 20.

[14] *Id.* ¶ 24.

[15] *December Letter* at 1.

[16] *Motion* at 11–12; *see also* Dkt. 55-4, *Declaration of Aundrea Peterson Ex. 4*, *Chamber Gallery Photographs*.

[17] *December Letter* at 1–2; *Motion* at 11–12; Dkt. 55, *Declaration of Aundrea Peterson* ¶¶ 3–5.

[18] *Motion* at 11–12; *see also Amended Complaint* ¶¶ 53, 59.

[19] *Amended Complaint* ¶ 26.

senate galleries, access to the press room, and access to the senate chamber floor when it is adjourned.[20]

The initial 2018 credentialing policy provided that reporters must be associated with institutions possessing, at a minimum, the following characteristics: (1) it hires and fires employees, and can be held responsible for actions, including lawsuits for libel; (2) it maintains editors to whom the reporters are responsible; (3) it requires employees to have some degree of education and/or professional training in journalism; (4) it adheres to a defined professional code of ethics; (5) it has been in business for a period of time and has a track record; and (6) it is not a lobbyist organization or a political party.[21]  The 2018 credentialing policy also designated criteria for people who were not eligible credentials.[22]  These included blog site owners with little or no editorial oversight, individuals who had little or no institutional framework, organizations with no history or track record, institutions or reporters whose main purpose seems to be lobbying or pushing a particular point of view, and organizations not bound by a journalistic code of ethics.[23]  Additionally, the 2018 Policy stated characteristics of reporters and media institutions change over time and noted the credentialing requirements would "likely change as the characteristics of the media industry evolve and become more clear."[24]

As anticipated, the credentialing policy was periodically updated.  The 2019 revision permitted blog owners or organizations "not bound by a code of ethics" to obtain credentials subject to revocation if they signed a document attesting they would "abide by the journalistic

---

[20] Dkt. 36-1, 2018 Utah Capitol Media Credentialing Policy (*2018 Media Policy*).

[21] Dkt. 55-5, *2018 Utah Capitol Media Credentialing Policy* (*2018 Policy*).

[22] *Id.*

[23] *Id*.

[24] *Id.*

code of ethics."[25]  The 2020 Policy officially incorporated the requirements that applicants must:
(1) be a professional journalist; (2) present a background check; (3) adhere to a professional code
of ethics; (4) represent news organizations or publications that have a track record; and
(5) complete unlawful harassment prevention training.[26]

The credentialing policy was updated again in 2021 and 2022.  The 2021 Policy
expanded credential privileges to include access to "designated areas of the Senate and House
chambers," workspace in committee rooms during committee hearings, and the ability to conduct
interviews "in the lounge area."[27]  The 2021 Policy also included a statement that "[b]loggers
representing a legitimate independent news organization may become credentialed under some
circumstances."[28]  The 2022 Policy remained largely unchanged, but added that credentials could
be denied or revoked if an "[a]pplicant does not represent a professional media organization," or
"does not regularly cover the Legislature in person at the Capitol."[29]

The 2023 and 2024 Policies further restricted media credentials for bloggers.  Where
bloggers were previously able to obtain media credentials in "some circumstances," the updated
Policies stated bloggers would be able to obtain media credentials only in "rare circumstances."[30]

In November 2024, the media credentialing policy was again updated for the 2025
legislative session.[31]  The 2025 Policy categorically excluded "blogs, independent media or other

---

[25] Dkt. 55-6, *2019 Utah Capitol Media Credentialing Policy* (*2019 Policy*).

[26] Dkt. 55-7, *2020 Utah Capitol Media Credentialing Policy* (*2020 Policy*).

[27] Dkt. 55-8, *2021 Utah Capitol Credentialing Policy* (*2021 Policy*).

[28] *Id.*

[29] Dkt. 55-9, *Utah Capitol Media Access and Credentialing Policy 2022* (*2022 Policy*).

[30] *Compare* 2021 Policy & 2022 Policy *with* Dkt. 55-10, *Utah Capitol Media Access and Credentialing Policy Revised October 2022* (*2023 Policy*); Dkt. 55-11, *Utah Capitol Media Access and Credentialing Policy Revised October 2023* (*2024 Policy*).

[31] Dkt. 55-12, *Utah Capitol Media Access and Credentialing Policy Revised November 2024* (*2025 Policy*).

freelance media."[32]  Prior to the 2025 legislative session, 134 media credentials were issued to applicants representing media organizations with disparate views on Utah politics.[33] Additionally, one media credential was issued to Building Salt Lake, a "locally owned, independent" website "founded in 2014 to cover urban real estate development in the Salt Lake City region."[34]

### C.  Bryan Schott's 2025 Legislative Session Credentials Application

Bryan Schott reported on the 2024 legislative session as a media-credentialed employee of the Salt Lake Tribune.[35]  During the 2024 session, Schott posted a photo of staffers on X.com and stated, "Staffers have been struggling to set up the backdrop for at least 10 minutes and never got it completely straight #utpol."[36]  In response to Schott's post, Defendant Osborne commented, "Bryan, you are a dick!  As a reporter, I can't believe you think it's okay to blast staff for doing their job.  You could have got up and helped, but you chose to just tweet about it. #classless."[37]  Schott continued to report on the Utah legislature throughout the rest of 2024 session in a manner Schott describes as "critical of the Utah Legislature or its leaders."[38]

On September 9, 2024, a correspondent for the Salt Lake Tribune informed the Osborne and Musselman that Schott was no longer employed with the Salt Lake Tribune.[39]

---

[32] *Id*.

[33] *Id*.

[34] Building Salt Lake, https://perma.cc/WYG3-P7UY (last visited Sep. 11, 2025); *see also Amended Complaint* ¶¶ 68–69; *Declaration of Aundrea Peterson* ¶¶ 45–48.

[35] *Amended Complaint* ¶¶ 13, 45, 56–57.

[36] *Id*. ¶ 50; *see also* Dkt. 56-9, *Declaration of Alexa Musselman Ex. 9*, *Schott Message and Photograph*.

[37] *Amended Complaint* ¶ 50.

[38] *Id*. ¶ 136.

[39] *Tribune Email*.

On December 12, 2024, Schott published a story on UPW stating a local nonprofit group had filed a complaint against Senate President Stuart Adams alleging President Adams had violated campaign disclosure laws.[40]  That same day, President Adams posted on X.com referring to Schott as a "former media member" and stated Schott's story was "part of a troubling pattern of neglectful journalism that undermines the profession's integrity."[41]  President Adams disclaimed any misconduct and stated Schott "failed to include information from the Lt. Governor's Office or those in the story before publishing the blog" and called the story inaccurate and misleading.[42]  President Adam's Deputy Chief of Staff, Aundrea Peterson, also criticized Schott's conduct in publishing the story without Peterson's comment and accused Schott of lacking professionalism, being irresponsible, and disregarding "accurate reporting and ethical standards."[43]

On December 17, 2024, Schott applied for a media credential for the 2025 legislative session.[44]  Schott did not disclose Morrell's editorial role with UPW in his 2025 application.[45]  Legislative staff rejected Schott's application stating, "Utah Capitol media credentials are currently not issued to blogs, independent, or other freelance journalists."[46]

Schott appealed this denial and on December 26, 2024, Defendants Osborne and Thomas upheld the denial, explaining Schott failed to meet the requisite criteria of "[b]eing a professional

---

[40] *Amended Complaint* ¶¶ 51–52.

[41] *Id.*

[42] Dkt. 36-9, *Amended Complaint Ex. 9, Text Exchange Between Bryan Schott and Aundrea Peterson*.

[43] *Id.*

[44] *Amended Complaint* ¶ 56.

[45] *Id.* ¶ 19; *Motion to Dismiss* at 4.

[46] *Amended Complaint* ¶ 60.

member of the media associated with an established, reputable news organization or publication" and that "[b]logs, independent media outlets or freelance media do not qualify for credentials."[47]

On January 22, 2025, Plaintiffs filed a Complaint[48] asserting four claims for § 1983 violations of the First and Fourteenth Amendments against Defendants Mark Thomas, Utah Senate Chief of Staff; Abby Osborne, Utah House of Representatives Chief of Staff; Aundrea Peterson, Utah Senate Deputy Chief of Staff; and Alexa Musselman, Utah House of Representatives Communications Director and Media Liaison.  Plaintiffs also filed a Motion for a Temporary Restraining Order[49] requesting that Defendants be ordered to grant Plaintiffs media credentials to the 2025 Utah Legislative Session.[50]

On February 5, 2025, the court heard oral argument, denied Plaintiffs' TRO Motion without prejudice, and granted Schott leave to file an amended complaint.[51]  On February 26, 2025, Plaintiffs filed an Amended Complaint and an Amended Motion for a Preliminary Injunction.[52]  Plaintiffs assert five claims under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments of the United States Constitution: (1) unreasonable and viewpoint-based denial of press credentials[53]; (2) content and viewpoint discrimination[54]; (3) retaliation[55];

---

[47] Dkt. 36-10, *Amended Complaint Ex. 10*, *Letter from Legislative Staff to Bryan Schott* (Dec. 26, 2024).

[48] Dkt. 2, *Complaint for Declaratory, Injunctive, and Other Relief* (*Complaint*).

[49] Dkt. 3, *Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support* (*TRO Motion*).

[50] *See Complaint* at 22–23, *TRO Motion* at 26.

[51] Dkt. 31, *Minute Entry*.

[52] *See Amended Complaint*; *Preliminary Injunction Motion*.

[53] *Amended Complaint* ¶¶ 103–20.

[54] *Id.* ¶¶ 121–33.

[55] *Id.* ¶¶ 134–39.

(4) prior restraint[56]; and (5) vagueness.[57]  On April 8, 2025, Defendants filed their Motion to

Dismiss, arguing Plaintiffs failed to state claims upon which relief can be granted.[58]  The

Motions are fully briefed.[59]  Having carefully considered the relevant filings, the court finds that

oral argument is not necessary and decides this matter based on the written memoranda and

accompanying exhibits.[60]

## LEGAL STANDARD

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint "must contain a short

and plain statement of the claim showing that the pleader is entitled to relief."[61]  To survive a

Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"[62]  "The plausibility standard is not akin to a 'probability requirement.'"[63]

A plaintiff must allege "more than [the] sheer possibility that a defendant has acted unlawfully";

a complaint that pleads facts "merely consistent with a defendant's liability . . . stops short of the

line between possibility and plausibility of entitlement to relief."[64]  To "nudge" a complaint

"across the line from conceivable to plausible" requires more than "the mere metaphysical

---

[56] *Id.* ¶¶ 140–44.

[57] *Id.* ¶¶ 145–55.

[58] *Motion* at 14–32; *see also* Fed. R. Civ. P. 12(b)(6).

[59] Dkt. 59, *Plaintiffs' Response to Defendants' Motion to Dismiss* (*Opposition*); Dkt. 62, *Reply in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint* (*Reply*); Dkt. 54, *Defendants' Response in Opposition to Plaintiffs' Amended Motion for Preliminary Injunction* (*Preliminary Injunction Opposition*); Dkt. 61, *Plaintiffs' Reply in Support of Amended Motion for Preliminary Injunction* (*Preliminary Injunction Reply*).

[60] *See* DUCivR 7-1(g).

[61] Fed. R. Civ. P. 8(a)(2).

[62] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[63] *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1159 (10th Cir. 2021) (cleaned up).

[64] *Id.* (cleaned up).

possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims."[65] Rather, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[66]

"The court's function on a Rule 12(b)(6) is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[67]  The  court begins "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[68]  The court then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."[69]  "The nature and specificity of the allegations required to state a plausible claim will vary based on context,"[70] but "the court need not accept conclusory allegations without supporting factual averments."[71]

## ANALYSIS

Plaintiffs assert five claims under § 1983 for violations of their constitutional rights under the First and Fourteenth Amendments.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[72]  "The First Amendment provides that Congress shall make no law . . . abridging the freedom [of speech, or]

---

[65] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (cleaned up).

[66] *Id.* (emphasis in original).

[67] *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[68] *Ashcroft*, 556 U.S. at 679.

[69] *VDARE Found.*, 11 F.4th at 1159.

[70] *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (cleaned up).

[71] *VDARE Found.*, 11 F.4th at 1159 (cleaned up).

[72] *West v. Atkins*, 487 U.S. 42, 48 (1988).

of the press," and this "liberty [is] safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action."[73] Plaintiffs allege the 2025 Policy constitutes unreasonable and viewpoint discrimination, content and viewpoint discrimination, retaliation, prior restraint, and vagueness. The court addresses the claims in turn.

### Claims I & II: Unreasonable Content and Viewpoint Discrimination

In Claims One and Two, Plaintiffs allege that by denying Schott a media credential, Defendants: (1) unreasonably "denied him equal access" to media-designated areas based on his "affiliation" with independent media,[74] and (2) discriminated against him because his "stream-of-consciousness reporting" "offend[ed] the refined sensibilities of the government actors" and criticized members of the legislature.[75] Defendants argue Plaintiffs have not alleged an infringement of an activity protected by the First Amendment.[76] The court agrees with Defendants.

At the heart of Plaintiffs' claims is an assertion of an unequivocal right to gather news. However, the First Amendment "does not invalidate every incidental burdening of the press that may result from the enforcement of [governmental policies] of general applicability."[77] Further, "[t]here is no constitutional right to have access to particular government information."[78] The First Amendment is concerned with "freedom of the media to *communicate* information once it is obtained"; the Constitution does not "*compel*[] the government to provide the media with

---

[73] *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 556 (1976) (cleaned up).

[74] *Amended Complaint* ¶¶ 103–20.

[75] *Id.* ¶¶ 121–33.

[76] *Motion* at 9 (cleaned up).

[77] *Branzburg v. Hayes*, 408 U.S. 665, 682 (1972).

[78] *Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978).

information or access to it on demand."[79]  "This applies equally to both the public and press, for

the press, generally speaking, do not have a special right of access to government information

not available to the public."[80]  Some government restrictions may impinge on the "flow of

information," but not all restrictions implicate the First Amendment.  As Justice Warren stated in

*Zemel v. Rusk*:

> There are few restrictions on actions which could not be clothed by the
> ingenious garb of decreased data flow.  For example, the prohibition of
> unauthorized entry into the White House diminishes the citizen's opportunities
> to gather information he might find relevant to his opinion of the way the
> country is being run, but that does not make entry into the White House a First
> Amendment right.  The right to speak and publish does not carry with it the
> unrestrained right to gather information.[81]

Following the guidance of the Supreme Court, the Tenth Circuit has adopted a three-step

framework for analyzing First Amendment activity on government property.[82]  The court first

considers whether the activity at issue is protected by the First Amendment.[83]  If it is not, the

inquiry ends.[84]  Plaintiffs assert Defendants violated Plaintiffs' right to gather news by denying

Schott a media credential to cover the legislative session.  The Tenth Circuit addressed a similar

issue in *Smith v. Plati*.

The plaintiff in *Smith* maintained a non-profit website that "provide[d] information,

pictures, chat rooms, and message boards covering men's and women's athletic teams at the

---

[79] *Id.* at 9 (emphasis in the original).

[80] *Smith v. Plati*, 258 F.3d 1167, 1178 (10th Cir. 2001).

[81] *Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965).

[82] *See Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1138 (10th Cir. 2001).

[83] *Id.* (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

[84] *Cornelius*, 473 U.S. at 797 (stating that if the activity is not protected by the First Amendment "we need go no further").  If the activity is protected, then courts "identify the nature of the forum," and "assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard."  *Id.*

University of Colorado."[85]  It appears that, for some time, the plaintiff had access to "resources . . . routinely given to other media," but then the defendant began to hinder his access and "d[id] everything possible to interfere with it."[86]  Specifically, the plaintiff alleged the University media liaison ticketed him for trespassing in a hallway, denied him resources given to other media and other fans, denied him treatment as "media" or "press," prevented him from "talking to coaches, excluded him from football practices, . . . and kept him from distributing [his website's] advertisements at a University athletic event."[87]  The plaintiff asserted a § 1983 claim for violating "his First Amendment right to 'gather news' from the University," and retaliating against him for exercising the same.[88]  The Tenth Circuit held the defendant had not violated any protected First Amendment right because "there is no general First Amendment right of access to all sources of information within governmental control," and the press does not have a "special right of access to government information not available to the public."[89]  Further, the Circuit did not modify or qualify this rule even though the plaintiff sought access to resources that were "routinely given to other media."[90]

Plaintiffs have made very similar allegations in this case.  Plaintiffs contend Defendants "deprived [them] of their First Amendment rights to news gather and exercise editorial judgment" based on Schott's status as an "independent reporter for a blog."[91]  Defendants argue

---

[85] *Smith*, 258 F.3d at 1172.

[86] *Id.*

[87] *Id.*

[88] *Id*. at 1173.  The plaintiff also asserted other claims not addressed here.  *See id.* at 1173.

[89] *Id.* at 1178.  *See also Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) (stating the First Amendment does not "guarantee the press a constitutional right of special access to information not available to the public generally") ; *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("The right to speak and public does not carry with it the unrestrained right to gather information.").

[90] *Smith*, 258 F.3d at 1172, 1177–78.

[91] *Amended Complaint* ¶¶ 107, 111, 122, 132.

this is not a protected First Amendment activity,[92] and Plaintiffs do not respond to this argument.[93]  Defendants further maintain that denying Schott a credential has not impinged on Plaintiffs' First Amendment rights because they still have access to government information available to the public.[94]  Plaintiffs do not contend they lack access to all government information available to the public.  Instead, Plaintiffs respond that the 2025 Policy violates Plaintiffs' constitutional rights because it denies them access "equal to the rights of other credentialed media representatives."[95]  However, as *Smith* demonstrates, the First Amendment does not encompass a right to "resources . . . routinely given to other media,"[96] and Plaintiffs do not "do[] not point to any Supreme Court or Tenth Circuit precedent establishing the right of access [they] seek[]."[97]  Accordingly, Plaintiffs have failed to plausibly allege a First Amendment violation in Claims One and Two.

---

[92] *See Motion* at 9–15.

[93] *See generally*, *Opposition* (failing to address whether media have a right of access to information not generally available to the public).

[94] *Motion* at 10 ("Committee meetings, legislative floor debates, agenda items, and materials are readily accessible on the legislative website, and everyone is welcome to attend committee meetings and floor time.").

[95] *Opposition* at 7.

[96] *Smith*, 258 F.3d 1167, 1177–78.

[97] *Id.* at 1178.  Plaintiffs instead reference a handful of cases from the D.C., Second, and Ninth Circuits.  *See Opposition* at 7–10 (citing *Consumers Union v. Periodical Correspondents' Assoc.*, 365 F. Supp. 18 (D.D.C. 1973), *rev'd*, *Consumers Union v. Periodical Correspondents' Assoc.*, 515 F.2d 1341 (D.C. Cir. 1975) (reversing the District of D.C. decision as nonjusticiable and ordering dismissal); *Associated Press v. Budowich*, 2025 WL 1649265 (D.C. Cir. Jun. 6, 2025) (granting a partial stay of a preliminary injunction because the space was not "opened for private speech and discussion"); *Sherrill v. Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977) (addressing the need for "procedural requirements of notice of the factual bases" for denying a press credential); *TGP Commc'ns., LLC v. Sellers*, 2022 WL 17484331 (9th Cir. Dec. 5, 2022) (granting a preliminary injunction because the press pass denial was likely based on viewpoint discrimination); *Am. Broadcast Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d. Cir. 1977). (determining whether enforcement of a criminal trespass statute against a news organization attempting to cover post-election activities at campaign headquarters not generally available to the public should be enjoined)).

## II. Claim III: Retaliation

Plaintiffs also assert Defendants violated Plaintiffs' First Amendment rights by denying Schott a media credential in retaliation for his prior unfavorable reporting.[98]  For a retaliation claim, Plaintiffs must plausibly allege: (1) that they were "engaged in [a] constitutionally protected activity"; (2) Defendants' "actions caused [Plaintiffs] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) Defendants' "adverse action was substantially motivated as a response to [Plaintiffs'] exercise of constitutionally protected conduct."[99]  "[T]he second element—the person of ordinary firmness element—is a vigorous standard" that is "assessed objectively."[100] Additionally, "a trivial or de minimis injury" is insufficient to support a First Amendment retaliation claim.[101]

Plaintiffs' allegations are insufficient to infer a denial of a media credential would "chill a person of ordinary firmness from continuing" unfavorable reporting.  To support their retaliation claim, Plaintiffs incorporate the prior allegations and allege the elements of a retaliation claim.[102] Although it is not clear what prior allegations Plaintiffs intend to support their retaliation claim, the court assumes Plaintiffs refer to the allegations that "Schott's reporting drew the ire of

---

[98] *See Amended Complaint* ¶¶ 134–39.

[99] *Trant v. Oklahoma*, 754 F.3d 1158, 1169–70 (10th Cir. 2014).

[100] *VDARE Found.*, 11 F.4th at 1172.

[101] *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007) (stating that when a "plaintiff alleges that the defendant's action was taken in retaliation for protected speech, . . . a trivial or de minimus injury will not support a retaliatory prosecution claim"); *see also Eaton v. Meneley*, 379 F.3d 949, 955 (10th Cir. 2004) ("[W]hen [a] plaintiff alleges that the defendant's action was taken in retaliation for protected speech, our standard for evaluating that chilling effect on speech is objective, rather than subjective.  The harm must be of the type that would chill a person of ordinary firmness from continuing to engage in the protected speech.  Thus, although the objective standard permits a plaintiff who perseveres despite governmental interference to bring suit, 'a trivial or de minimis injury will not support a retaliatory prosecution claim.'" (quoting *Poole v. Cnty. of Otero*, 271 F.3d 955, 960 (10th Cir. 2001) (cleaned up).

[102] *See Amended Complaint* ¶¶ 134–39.

15

legislative leaders"[103] and that Defendants subsequently denied his media credential
application.[104]  But it is unclear why these allegations support an inference that a person of
ordinary firmness would be chilled when Plaintiffs in fact reported on the 2025 legislative
session without a media credential.[105]  Plaintiffs contend that their continued reporting is due to
Schott's "persistence" and "Defendants actions would [objectively] chill and adversely affect
any person of ordinary firmness from exercising their First Amendment speech rights."[106]  But
this a speculative conclusion not supported with factual allegations in the Amended Complaint
and "not entitled to the assumption of truth."[107]

Plaintiffs also maintain they "have been actually chilled and adversely impacted" because
they are "unable to report on in-the-room context and publish breaking news in real time."[108]
But all proceedings of the legislative session are open to the public.  Any person may observe the
legislative action from the chamber galleries where the media workspaces are located,[109] and all
official legislative action is livestreamed and archived on the Legislature's website.[110]  Plaintiffs
also remain able to speak with legislators and their staff in public spaces or through other private

---

[103] *Id.* ¶ 46.

[104] *Id.* ¶¶ 46, 60.

[105] *Motion* at 11–13; *Opposition* at 18–19; *see also Washington v. Martinez*, No. 19-cv-00221-MEH, 2020 WL
209863, at *6 (D. Colo. Jan. 14, 2020) ("[P]ersistence in speech is some evidence that the defendant's actions would
not prevent such speech.").

[106] *Opposition* at 18–19.

[107] *Ashcroft*, 556 U.S. at 679.

[108] *Opposition* at 19.

[109] *Motion* at 11–12; *see also* Dkt. 55-4, *Declaration of Aundrea Peterson Ex. 4, Chamber Gallery Photograph*.

[110] *Id.* at 11–13.

channels.[111]  Accordingly, the court concludes that any injuries Plaintiffs allege are trivial or de minimis injuries and inadequate to support a retaliation claim.[112]

### III. Claim IV: Prior Restraint

Plaintiffs also assert the 2025 Policy constitutes an unlawful prior restraint because "[b]y requiring that all applicants obtain press credentials from [the] Utah Legislature, the policy establishes a regime that gives the government unbridled discretion to permit the exercise of First Amendment rights, without any immediate judicial review,"[113] and this "unbridled discretion" "deprives Plaintiffs of their free speech and press rights."[114]

Prior restraint is "[a] governmental restriction on speech or publication before its actual expression" or "formal censorship before publication."[115]  The Supreme Court has held that "in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."[116] However, not every licensing law involving discretion constitutes prior restraint.[117]  "The law must have a close enough nexus to expression, or to conduct commonly associated with

---

[111] *Id.* at 20; *see also Amended Complaint* ¶¶ 53, 59.

[112] *See Shero*, 510 F.3d at 1204 (concluding the defendant's actions in denying access to council packets prior to city council meetings was at best a de minimis injury); *see also Smith*, 258 F.3d at 1177 (concluding a reporter did not "suffer an injury that would chill a person of ordinary firmness from continuing to publish an internet site" because "alternative avenues to information remained open," and the plaintiff retained "the ability to speak freely about any political, social or other concern"); *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006) ("Having access to relatively less information than other reporters on account of one's reporting is so commonplace as to allow [the publication] to proceed on its retaliation claim addressing that condition would plant the seed of a constitutional case in virtually every interchange between public office and press.  Accordingly, . . . no actionable retaliation claim arises when a government official denies a reporter access to discretionally afforded information.") (cleaned up)).

[113] *Amended Complaint* ¶ 141.

[114] *Id.* ¶ 143.

[115] *Prior Restraint*, BLACK'S LAW DICTIONARY, 12th ed. 2024.

[116] *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988).

[117] *Id.* at 759.

expression, *to pose a real and substantial threat of the identified censorship risk.*"[118]  "[L]aws of general application that . . . do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken" or "who may speak and who may not" are not unconstitutional.[119]

The 2025 Policy for media credentials does not regulate who may speak or what a reporter may or may not publish.  Any reporter has access to the legislative session and is not restricted in the content of any potential publication.  A media credential permits access to the press room, workspaces in the senate and house galleries, designated parking, and press events with elected officials.[120]  However, members of the public have access to the chambers galleries and may observe committee meetings and legislative floor debates.[121]  Additionally, legislative agenda items and other materials are posted on the legislature's website, and all official legislative action is livestreamed and archived on the legislature's website.[122]  Plaintiffs have not alleged that the 2025 Policy restricts the content of their speech or that the 2025 Policy will somehow censor their speech in the future.[123]  Indeed, as explained above, Plaintiffs reported on the 2025 legislative session without a media credential, and Plaintiffs have not alleged the Policy impacted the content of what they reported.[124]  Further, to the extent Plaintiffs allege Defendants may potentially wield the 2025 Policy in a discriminatory way, these allegations are

---

[118] *Id.* at 760–61, 763 (emphasis added).

[119] *Id.* at 763.

[120] *See 2025 Policy*.

[121] *Motion* at 2.

[122] *Id.* at 11–13.

[123] *See generally*, *Amended Complaint*.

[124] *Motion* at 13.

speculative.[125]  Accordingly, the court concludes Plaintiffs have not asserted an actionable prior restraint claim.

### IV. Claim V: Vagueness

Finally, Plaintiffs claim the 2025 Policy is unconstitutionally vague.[126]  In their Motion, Defendants argue the void-for-vagueness doctrine does not apply and, even if it did, the Policy is not vague.[127]  The court agrees that Plaintiffs have not plausibly alleged the 2025 Policy is vague.

The vagueness doctrine is rooted in the Due Process Clause of the Fifth Amendment, not the First Amendment.[128]  It addresses the due process concerns "that regulated parties should know what is required of them so they may act accordingly" and is meant to ensure laws are not enforced "in an arbitrary or discriminatory way."[129]  A statute is unconstitutionally vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" and "if it authorizes or . . . encourages arbitrary and discriminatory enforcement."[130]  However, language is inherently imprecise, so "mathematical certainty" is not required.[131]

Plaintiffs argue the 2025 Policy is vague because certain criteria are not defined. Specifically, Plaintiffs contend (1) "[i]t is unclear what is meant by 'established,' 'reputable,' 'blog,' 'freelance,' or 'independent' media"; (2) the 2025 Policy does not define what ethics

---

[125] *See id.* ¶¶ 140–44.

[126] *Amended Complaint* ¶¶ 145–55.

[127] *Motion* at 28–32.

[128] *See United States v. Williams*, 553 U.S. 285, 304 (2008).

[129] *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023).

[130] *Id.*

[131] *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

journalists must adhere to; (3) the 2025 Police "create[s] ever-shifting goal posts for compliance"; and (4) "Plaintiffs cannot understand how they could qualify for a press credential under these vague criteria."[132]  Defendants counter that these terms "are commonly understood in the English language" and are well understood in context.[133]  The court agrees the 2025 Policy does not include terms that are not commonly understood.  Further, the 2018 and 2019 Policies included additional "defining characteristics," some of which were incorporated in later iterations of the policy.[134]  The credentialing criteria are sufficient to "provide fair notice to the public" of what the requirements are and ensure the Policy is not administered arbitrarily.[135]  Indeed, Plaintiffs acknowledged on social media that the new credentialing criteria could "shut [Schott] out" prior to Defendants' credentialing decision.[136]  Because the 2025 Policy uses commonly-understood terms and Plaintiffs themselves anticipated they would be denied a media credential according to the Policy criteria, the court concludes Plaintiffs have not plausibly alleged the Policy is unconstitutionally vague.

## CONCLUSION

For the reasons stated above, the court concludes the Amended Complaint does not contain sufficient well-pleaded factual allegations, accepted as true, to "plausibly give rise to an entitlement to relief" under any of their claims.[137]  Accordingly, the court

---

[132] *Amended Complaint.*¶¶ 149–50, 152.

[133] *Motion* at 30.

[134] *Compare 2018 Policy*; *with 2019 Policy*; *and 2025 Policy*.

[135] *See Wyo. Gun Owners*, 83 F.4th at 1233.

[136] *See* https://perma.cc/SV5K-XTWW (containing a post by Schott stating "On Tuesday, the Utah Legislature begins the process of issuing media credentials for the 2025 session.  In the last month, they revised the criteria for obtaining a credential, and many of those new requirements will likely be weaponized against me and were likely designed to shut me out.").

[137] *VDARE Found.*, 11 F.4th at 1159.

GRANTS[138] Defendants' Motion to Dismiss and DENIES[139] as moot Plaintiffs' Amended

Motion for Preliminary Injunction.

　　　SO ORDERED this 29th day of September 2025.

　　　　　　　　　　　　　BY THE COURT:

　　　　　　　　　　　　　ROBERT J. SHELBY
　　　　　　　　　　　　　United States Chief District Judge

---

[138] Dkt. 53.

[139] Dkt. 37.